STATE OF MAINE                                     BUSINESS AND CONSUMER COURT

Cumberland, ss.


CLAIRE DEAN PERRY,

                    Plaintiff,

            v.                                      Docket No. BCD-CV-13-48

WILLIAM T. DEAN, JR., et al.,,

                    Defendants

_____


PAMELA W. VOSE, Personal Representative
of the Estate of William T. Dean, Jr.,

                    Plaintiff,

            v.                                      Docket No. BCD-CV-14-14

JAMES P. TAYLOR, et al.,

                    Defendants


## ORDER ON PLAINTIFF VOSE'S MOTION FOR RECONSIDERATION AND MOTION TO ALTER OR AMEND

Plaintiff Pamela W. Vose has filed a Motion for Reconsideration of certain issues addressed in the court's orders on the summary judgment motions filed by Plaintiff Vose, the State Defendants and Defendant James Taylor. *See Perry v. Dean*, Order on State Defendants' Motion for Summary Judgment (Dec. 3, 2015); *Vose v. Taylor*, Order on Cross-Motions for Summary Judgment of Plaintiff and Defendant (Dec. 3, 2015).

Also still pending is Plaintiff Vose's Motion to Alter or Amend Order of Summary Judgment in *Perry v. Dean*, which is dated December 17, 2014, and which was not fully briefed due to the filing of the State's appeal from that summary judgment order. The Motion to Alter

or Amend Order of Summary Judgment raises the same issue regarding Plaintiff's claim against attorney Barbara Cardone that is now raised in Plaintiff Vose's Motion for Reconsideration.

Oral argument on the Motion for Reconsideration was held June 1, 2017.

Plaintiff Vose's Motion for Reconsideration and previously filed Motion to Alter or Amend ask the court to reinstate Counts IX and X of Plaintiff Vose's cross-claim, which allege that attorney Cardone is liable for violating 42 U.S.C. § 1983 and for breach of fiduciary duty to Mr. Dean. Attorney Cardone represented the Maine Department of Health and Human Services (DHHS) in its capacity of temporary conservator for William Dean at the time DHHS arranged for the sale of Mr. Dean's Owls Head property to Defendant Taylor.

The Motion for Reconsideration also asks the court to reconsider its denial of summary judgment to Plaintiff Vose on her claim for a declaratory judgment that the deed to Mr. Taylor for the Owls Head property was void *ab initio*.

*Claims Against Attorney Cardone*

The Court's Order on State Defendants' Motion for Summary Judgment in *Perry v. Dean* addressed Mr. Dean's claims against attorney Cardone at pages 52-63 (Count X) and 65-66 (Count IX), and the court sees no reason to revisit its analysis and conclusions set forth therein.

Further discussion of one issue not reached by the court in that Order merits further discussion because it was a primary focus of the oral argument. The breach of fiduciary duty claim in Cross-Claim Count X is premised on the view that attorney Cardone owed a fiduciary duty to Mr. Dean, the ward, as well as a duty to her client, DHHS. Plaintiff Vose points out that Maine recognizes that an attorney may owe a duty to a non-client "when an attorney's actions are intended to benefit a third party and where policy considerations support it . . ." *Estate of Cabatit v. Canders*, 2014 ME 133, ¶21, 105 A.3d 439, 446. An example of such a

2

situation is when an attorney is negligent in preparing an estate plan and the court allows the client's estate to bring a malpractice action against the attorney. In fact, the *Cabatit* opinion cites to a New York case involving such circumstances. *Id., citing Schneider v. Finmann,* 15 N.Y.3d 306, 933 N.E.2d 718 (2010). In such a situation, the attorney's duty extends to the non-client estate because the estate is the foreseeable beneficiary of the attorney's services and because there is no potential conflict between the attorney's duty of reasonable care to the estate planning client and the duty of care with respect to the estate. *See id.,* 933 N.E.2d at 720-21 (noting that a decedent's estate "stands in the shoes of the decedent").

However, the court in *Cabatit* noted that "[a]n attorney will never owe a duty of care to a nonclient, however, if that duty would conflict with the attorney's obligations to his or her clients." 2014 ME 133 at ¶21, 105 A.3d at 446, *citing Ramsey v. Baxter Title Co.,* 2012 ME 113, ¶ 11, 54 A.3d 710. Here, attorney Cardone's client wanted to sell the Owls Head property to Mr. Taylor, and was willing to thwart the efforts of Mr. Dean's family members to stop it. Plaintiff Vose says that attorney Cardone had a fiduciary duty to Mr. Dean and should not have assisted her client in selling the property to Mr. Taylor. Plainly, attorney Cardone could not have fulfilled her duty to her client and also fulfilled the duty to Mr. Dean that the Motion for Reconsideration asks the court to impose as a matter of law.

Whether the attorney for a conservator can ever owe a fiduciary duty to a protected person need not be decided here. At least under the circumstances of this case, to impose upon the attorney for a conservator a separate fiduciary duty toward the protected person would subject the attorney to conflicting obligations. The third-party beneficiary theory does not apply in this instance because to apply it would create a conflict between attorney Cardone's duty to her client and any separate duty to Mr. Dean, the protected person.

3

Accordingly, because both the Motion for Reconsideration and the Motion to Alter or Amend Order of Summary Judgment focus on the same issue, they will be denied regarding that issue.

*Claim Regarding Taylor Deed Being Void Ab Initio*

The gist of Plaintiff Vose's summary judgment motion and now her motion for reconsideration on the issue of the validity of the deed from DHHS as temporary conservator to James Taylor is that the deed is void because, under the Maine Probate Code, DHHS was required to obtain authorization from the Probate Court to convey Mr. Dean's Owls Head real estate to Mr. Taylor for less than fair market value. *See* 18-A M.R.S. § 5-408(6). The court denied Plaintiff Vose's summary judgment motion, and now denies her motion for reconsideration on this issue, because whether the DHHS conveyance to Mr. Taylor required prior Probate Court authorization raises disputed material issues of fact and law. The primary issue of fact is whether the sale to Mr. Taylor was indeed for less than fair market value. The primary issue of law is whether, assuming prior Probate Court authorization was required, an issue that the court has not had to address[1], whether the absence of prior authorization for the sale invalidates the deed.

IT IS ORDERED AS FOLLOWS: Plaintiff Pamela W. Vose's Motion for Reconsideration is denied. Plaintiff Pamela W. Vose's Motion to Alter Or Amend Order of Summary Judgment also is denied.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated June 5, 2017

_____
A. M. Horton, Justice

---

[1] As discussed at oral argument, the court views the effect of section 5-408 of the Maine Probate Code upon the transaction to involve issues of law that the court has not been called on to address because of the material factual dispute regarding the fair market value of the property at the time of the sale.

4

**Claire Dean Perry v. William T. Dean, Jr., et al.**
BCD-CV-13-48

**Pamela W. Vose v. James Taylor, et al.**
CV-14-14


| | |
|---|---|
| **Claire Dean Perry**<br>*Plaintiff* | Cynthia Dill,<br>511 Congress St<br>PO Box 9711<br>Portland, ME 04104-5011 |
| **William T. Dean, Jr.**<br>*Defendant* | David Jenny, Esq.<br>11 Shell St<br>PO Box 252<br>Owls Head, ME 04854 |
| **James P. Taylor**<br>*Defendant* | Zachary Greenfield, Esq.<br>361 US Route 1.<br>Falmouth, ME 04 |
| **State of Maine, DHHS**<br>**Janice Archer**<br>**David Vaughn**<br>**Barbara Cardone, Esq.**<br>*Defendants* | Christopher Taub, AAG<br>111 Sewall Street<br>6 State House Station<br>Augusta, ME 04333-0006 |
| **David Thistle**<br>*Defendant* | Thomas Bell, Esq.<br>2 Main St<br>Topsham, ME 04086 |

STATE OF MAINE                          BUSINESS AND CONSUMER COURT
CUMBERLAND, ss                          Location: Portland

CLAIRE DEAN PERRY,                    )
                                      )
            Plaintiff,                )
                                      )
    v.                                )         Docket No. BCD-CV-13-48 ✓
                                      )
WILLIAM T. DEAN, JR., et al.,         )
                                      )
            Defendants                )
————————————————————                  )
                                      )
PAMELA W. VOSE, Conservator for       )
WILLIAM T. DEAN, JR.,                 )
                                      )
            Plaintiff,                )
                                      )
    v.                                )         Docket No. BCD-CV-14-14 ✓
                                      )
JAMES P. TAYLOR, et al.,              )
                                      )
            Defendants                )

## ORDER ON STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Maine Department of Health and Human Services ("DHHS"), David Vaughan, Janice Archer, and Barbara Cardone (collectively, the "State Defendants") have filed a Motion for Summary Judgment against all claims brought against them by William T. Dean. Jr., as cross-claims in *Perry v. Dean* and as claims in *Vose v. Taylor*, through his conservator Pamela W. Vose. The State's Motion also seeks summary judgment on all claims asserted in *Perry v. Dean* by Plaintiff Claire Dean Perry. Although Mr. Dean is a nominal defendant in *Perry v. Dean*, because his and Ms. Perry's claims in both cases are the subject of the State Defendants' Motion, this Order refers to him and Ms. Perry as the "Plaintiffs."

The State Defendants argue that summary judgment is warranted based on various immunities possessed by the State Defendants and on the merits of Plaintiffs' claims. Together, the Plaintiffs assert the following claims against the State Defendants:

1) Abuse of process against Ms. Archer, Mr. Vaughan, and Attorney Cardone;
2) Intentional misrepresentation against Ms. Archer and Attorney Cardone;
3) Interference with a contract or expectancy against DHHS;
4) Negligent Discharge against DHHS;
5) Conversion against Mr. Vaughan;
6) 42 U.S.C. § 1983 claims for due process violations against Ms. Archer, Mr. Vaughan, and Attorney Cardone;
7) Breach of fiduciary duty against DHHS and Attorney Cardone;
8) Violation of the Maine Civil Rights Act against DHHS; and
9) Declaratory judgment that DHHS is not entitled to estate management fees from Mr. Dean's estate.[1]

Oral argument on the State Defendants' Motion was held October 5, 2015, together with argument on pending motions in *Vose v. Taylor*. In that case, Mr. Dean, through Ms. Vose, has moved for summary judgment declaring the public conservator's deed to 9 Castlewood Lane, Owls Head,

---

[1] Specifically, Ms. Perry in her First Amended Complaint asserts the following counts against the State Defendants:

    IV)    Interference with a contract or expectancy against DHHS;
    V)    Breach of fiduciary duty against DHHS;
    VI)    Deprivation of Property without Due Process pursuant to the Maine Civil Rights Act against DHHS;
    VIII) Abuse of process against Ms. Archer;
    IX)    Violation of 42 U.S.C. § 1983 deprivation of due process against Ms. Archer;
    X)    Abuse of process against Mr. Vaughan;
    XI)    Violation of 42 U.S.C. § 1983 deprivation of due process against Mr. Vaughan; and
    XIV) Violation of 42 U.S.C. § 1983 deprivation of due process against Attorney Cardone.

Mr. Dean in his Second Amended Complaint in *Vose v. Taylor* asserts a claim against DHHS for abuse of authority granted by the Probate Court's temporary conservatorship order, which appears to be a claim for breach of fiduciary duty. In addition, Mr. Dean's cross-claim, as a defendant in *Perry v. Dean,*, asserts the following counts against the State co-Defendants:

    III)    Negligent discharge of pollutants against DHHS;
    IV)    Breach of fiduciary duty against DHHS;
    V)    Violation of the Maine Civil Rights Act against DHHS;
    VI)    Declaratory judgment that DHHS is not entitled to estate management fees;
    VII)    Intentional misrepresentation against Attorney Cardone;
    VIII) Abuse of process against Attorney Cardone;
    IX)    Violation of 42 U.S.C. § 1983 deprivation of due process against Attorney Cardone;
    X)    Breach of fiduciary duty against Attorney Cardone;
    XI)    Intentional misrepresentation against Ms. Archer;
    XII)    Violation of 42 U.S.C. § 1983 deprivation of due process against Ms. Archer;
    XIII) Conversion against Mr. Vaughan; and
    XIV) Violation of 42 U.S.C. § 1983 deprivation of due process against Mr. Vaughan.

2

Maine, null and void *ab initio*. That motion, and the summary judgment motion filed by Defendant James P. Taylor against Ms. Vose, are addressed in a separate order of this date.[2]

Based on the entire record, and for the reasons discussed below, the court: 1) grants the State Defendants' motion for summary judgment against all of Ms. Perry's claims; 2) grants the State Defendants' motion for summary judgment against all of Mr. Dean's claims except for Count IV of his cross-claim for breach of fiduciary duty against DHHS in *Perry v. Dean* and Mr. Dean's claim in *Vose v. Taylor* against DHHS for abuse of authority granted by the Probate Court's temporary conservatorship order—to the extent that claim alleges a breach of fiduciary duty by DHHS.

*I. Background*[3]

Consistent with the summary judgment standard, the following recitation of the underlying facts is presented in a light favorable to the non-moving parties.

A.      Appointment of DHHS as Temporary Conservator

William T. Dean, Jr. is the older brother of Plaintiff Claire Perry. The two have no other siblings. Mr. Dean has been diagnosed with a form of Asperger's Syndrome and with a mental illness, both of which are treatable. (Pl.s' A.S.M.F. ¶ 1.) Prior to 2012, Mr. Dean withdrew from a bank trust account funds that were to be used for his and Plaintiff Perry's benefit. When she confronted him, he agreed to reimburse her, and also agreed that, until he reimbursed her in full, she could have exclusive occupancy of the cottage in Owls Head owned by him. (*See id.* ¶¶ 17-23; 7/27/15 Perry Aff. ¶¶ 12-17.)

---

[2] In *Vose v. Taylor*, Mr. Dean, through Ms. Vose, has moved for summary judgment declaring the public conservator's deed to 9 Castlewood Lane, Owls Head, Maine, null and void *ab initio*. That motion, and the summary judgment motion filed by Defendant James P. Taylor against Ms. Vose, are addressed in a separate order.

[3] For the sake of clarity, the court will use the following abbreviations when citing to statements of material fact from the State Defendants' motion for summary judgment: Def.s' Supp. S.M.F.; Pl.s' Opp. S.M.F.; and Pl.'s A.S.M.F. It will use the following abbreviations when citing to statements of material fact from Mr. Dean's motion for summary judgment: Dean's Supp. S.M.F.; DHHS's Opp. S.M.F.; and DHHS's A.S.M.F.

3

In May 2012, William T. Dean Jr. was admitted to PenBay Medical Center's emergency room. On May 17, 2012, a court ordered that Mr. Dean be hospitalized involuntarily for a period not to exceed 60 days. (Ex. A. to Burk Aff.) On May 25, 2012, Mr. Dean was transferred to Dorothea Dix Psychiatric Center ("DDPC"). (Def.s' Supp. S.M.F. ¶ 3.) Mr. Dean remained a patient at DDPC until June 7, 2013. (*See* Burk Aff. ¶ 4.) Before Mr. Dean became a patient at DDPC, he attempted to sell a cottage he owned in the Town of Owls Head because he was having financial difficulties. (DHHS's A.S.M.F. ¶ 48.)

While at DDPC, one of Mr. Dean's treating physicians, Dr. Judy Burk, learned that Mr. Dean owned two houses, and that he owed back taxes on both properties. (Burk Aff. ¶ 5.) Dr. Burk determined that Mr. Dean lacked the capacity to manage his financial affairs and, because of various issues, had concerns about a family member serving as his conservator. (*Id.* ¶¶ 6-11.) On June 27, 2012, Dr. Burk opined that Mr. Dean would benefit from appointment of a conservator. (Def.s' Supp. S.M.F. ¶ 7.) On July 3, 2012, Dr. Michelle Gardner provided a second opinion concurring that Mr. Dean would benefit from a conservator. (*Id.* ¶ 8; Pl.s' Opp. S.M.F. ¶ 8.)

By letter dated August 1, 2012, Leigh Wiley, a DDPC social worker, advised Mr. Dean that Drs. Burk and Gardner were recommending DDPC initiate protection proceedings. (Ex. D to Burk Aff.) The letter explained that the aforementioned doctors thought Mr. Dean "would benefit from a non-family member serving as conservator, or at least a family study to understand who in the family is best equipped to assist you in managing your complex finances." (*Id.*) The letter continued, however, to explain that because "we are concerned about your safety and well being" and because protective proceedings are "very time consuming," the hospital did not want to unnecessarily delay the process and would proceed "within three days of receipt of this letter" unless Mr. Dean's treating physicians were contacted. (*Id.*)

4

This letter was delivered to Mr. Dean and mailed to Ms. Perry, his younger sister and only sibling. (Def.s' Supp. S.M.F. ¶ 10; Pl.s' A.S.M.F. ¶ 9.) Ms. Perry asserts that she contacted Ms. Wiley by telephone on August 8, 2012, the same day she received the letter, and was informed that a family study would be done before any petition was filed in court. (7/27/15 Perry Aff. ¶¶ 8-10). Ms. Wiley, however, asserts that no one contacted her or—to the best of her knowledge—anyone else at DDPC to request a review of the findings. (Wiley Aff. ¶ 7.)

On August 9, 2012, Ms. Wiley wrote a letter to Martha Perkins, casework supervisor at the Office of Elderly Services with DHHS, referring Mr. Dean for a public conservatorship. (Ex. B to Wiley Aff.) The letter included a personal data form, which noted in pertinent part, that Pamela Vose, Mr. Dean's cousin, has agreed to become Mr. Dean's conservator, but might not be able to be an advocate for him due to pressure from Ms. Perry and other family members. (*Id.*) That letter was not sent to Mr. Dean or Ms. Perry. (Pl.s' A.S.M.F. ¶ 16.)

Mr. Dean's case was referred to a DHHS caseworker, Janice Archer, on August 14, 2012. (Def.s' Supp. S.M.F. ¶ 16.) Ms. Archer, a licensed social worker, met with Mr. Dean on August 29 and called the Owls Head town office to inquire into the taxes Mr. Dean owed that same day. (*Id.* at ¶¶ 17-18.) Ms. Archer asserts that she was informed Mr. Dean owed real estate taxes on his cottage in Owls Head for 2011 and 2012, and that his 2013 taxes were due. (Archer Aff. ¶ 4.) She claims that she was told the Town would foreclose on Mr. Dean's cottage if his 2011 taxes were not paid by February 11, 2013.[4] (*Id.*) Ms. Archer's notes from that day provide:

> If [Mr. Dean] pays the 2011 taxes it will buy him another year to sell or get caught up on taxes to avoid the foreclosure. As of todays date the amount for 2011 is $5559. The foreclosure date is set for February 11, 2013. If he looses

[4] The parties agree that the correct date for the tax lien foreclosure on the Owls Head cottage was February 12, 2013, not February 11, 2013. (Dean's Supp. S.M.F. ¶ 6.)

5

the property in foreclosure he looses all value in the home no matter if the town sells it for more then the amount of tax due. The town will foreclose even if the property is up for sale. The only thing that will stop foreclosure is payment of the taxes.

(Ex. 6 to Pl.s' Opp. S.M.F.) [sic]

On August 22, 2012, Ms. Perry orally advised Mr. Dean's treatment team and several DHHS employees of her agreement with Mr. Dean, including the fact that the agreement permitted her to occupy the Owls Head cottage until he had reimbursed her. (*See* Pl.'s A.S.M.F. ¶ 17; 7/27/15 Perry Aff. ¶ 12.)

On August 31, 2012, Ms. Archer called the Rockland office and was informed that Mr. Dean owed real estate taxes on his house in Rockland for 2011 and 2012, and would soon owe taxes for 2013. (Ex. 7 to Pl.s' Opp. S.M.F.) She was informed that the 2011 taxes totaled $2,266.66, were accruing interest everyday, and must be paid by March 13, 2013 to avoid foreclosure. (*Id.*)

Also on August 31, Ms. Vose left a voice message with Mr. Dean's social worker at DDPC, Ms. Sands, stating that she was ready to file a petition to be Mr. Dean's conservator/guardian. (Pl.s' A.S.M.F. ¶ 27.) Earlier in the summer, Ms. Vose had communicated with Ms. Sands about her willingness to serve as Mr. Dean's conservator, but had advised Ms. Sands that her husband's heart attack and subsequent by-pass surgery had temporarily occupied all of her time. (*Id.* ¶¶ 28-29.) Ms. Vose did not receive a return phone call about her willingness to serve as conservator until after DHHS was appointed temporary conservator. (Pl.s' A.S.M.F. ¶ 30.) Ms. Sands left a voice message stating that Ms. Vose's services were not needed because DHHS was appointed temporary conservator. (*Id.* ¶ 31.)

Ms. Archer asserts that she met with Mr. Dean on September 4, 2012 and informed him that she would be filing a petition to have DHHS appointed as public guardian and conservator.

(Archer Aff. ¶ 8.) She claims that Mr. Dean did not raise any opposition to the plan. (*Id.* ¶ 9.) Mr. Dean asserts that he has no recollection of the meeting. (Dean Aff. ¶ 2.)

On September 5, 2012, Ms. Archer filed a petition for DHHS to be appointed as Mr. Dean's guardian and conservator with the Penobscot County Probate Court. (Def.s' Supp. S.M.F. ¶ 24.) In the Petition, Ms. Archer asserted that Mr. Dean has not paid property taxes on the Owls Head cottage—with a tax assessed value of $476,840—or the Rockland house— with a tax assessed value of $177,200—since 2010 and that both properties were in imminent risk of foreclosure. (Ex. B to Archer Aff. at 3; Dean's Supp. S.M.F. ¶ 3.) The Petition further stated that if assistance were not provided to Mr. Dean, he would lose his two properties in early 2013, including any equity in them. (Ex. B to Archer Aff. at 3).

Ms. Archer also filed a guardianship/conservatorship plan in which she stated that if DHHS were appointed as conservator, Mr. Dean's property "in Owls Head will be sold and the proceeds used to pay back taxes on both the Owls Head and Rockland properties." (Def.s' Supp. S.M.F. ¶ 26.) The plan further states that DHHS "will secure the property in Rockland and assess if it is in [Mr. Dean's] best interest to keep the property and maintain it[,] or sell the property and use the proceeds for Mr. Dean's care." (Ex. C. to Archer Aff.)

In an affidavit accompanying the Petition, Ms. Archer stated that DHHS "would arrange for the property at Owls Head to be sold at a fair market price as soon as possible." (Def.s' Supp. S.M.F. ¶ 28.) The only alleged "emergency" identified in the petition was the risk of losing one or both of Mr. Dean's properties to tax foreclosure. (Pl.s' A.S.M.F. ¶ 70.) Ms. Archer affirmed that she provided notice of the Petition to Mr. Dean and Ms. Perry. (Ex. D to Archer Aff. at 2.) Ms. Perry and Mr. Dean, however, deny receiving that notice. (*See* Dean Aff. ¶ 3; 7/27/15 Archer Aff. ¶¶ 27-29.)

On September 6, 2012, the Probate Court held a hearing on the Petition. (Archer Aff. ¶ 14.) As of that date, Mr. Dean held title to both the Rockland house and Owls Head cottage. (Pl.s' A.S.M.F. ¶ 67.) Although he owed back property taxes on the properties, neither was encumbered by a mortgage. (*Id.* ¶ 68.)

Following the hearing, the Probate Court appointed DHHS as Mr. Dean's temporary conservator for a period not to exceed 6 months. (Ex. F to Archer Aff.) The Order found that Ms. Archer complied with the notice requirements and also stated that DHHS has the following limited powers and duties necessary to address the emergency necessitating the conservatorship: "To collect, hold, retain, maintain and transfer the assets of Mr. Dean...To receive additions to [Mr. Dean's] estate...[and][t]o pay Mr. Dean's ordinary and necessary bills associated with his[] care and maintenance or with his[] assets." (*Id.*) The Order also states:

> If it comes to the Court's attention, through the report of the visitor or guardian ad litem or otherwise, that the allegedly protected person wishes to contest any aspect of the temporary conservatorship or seek a limitation of the temporary conservator's powers, or that the issue exists with respect to whether the temporary conservatorship is in the allegedly protected person's best interests, the Court shall hold an expedited hearing within 40 days of the entry of the ex parte order.

(*Id.*) Ms. Perry learned that DHHS was appointed as temporary conservator when she called DDPC on the morning of September 6, 2012. (Pl.s' A.S.M.F. ¶ 54.)

Also on that date, a Justification for Disposition of Asset form was submitted to the DHHS Asset Disposition Committee requesting authorization to sell the Owls Head cottage "as soon as possible" because Mr. Dean would lose the property if back taxes were not paid by the February 2013 deadline. (Dean's Supp. S.M.F. ¶ 10.) On that form, Ms. Archer wrote that "[i]n reference to the need for this request to be accompanied by a current budget; the client has no income and no pending expected source of income." (*Id.* ¶ 13.)

8

DHHS's concern that Mr. Dean could lose the Owls Head property in February 2013 was justified. In January 2013, the Town sent Mr. Dean a "Notice of Impending Automatic Foreclosure," which explained that on February 12, 2013, the tax lien mortgage on the Owls Head cottage would be foreclosed and Mr. Dean's right to recover his property by paying taxes, interest and costs would expire. (Ex. A to Archer Aff.) The Notice explained, "IF THE TAX LIEN FORECLOSES, THE MUNICIPALITY WILL OWN YOUR PROPERTY," but also stated that "if you cannot pay the property taxes you owe, please contact [Harriet Ferguson, Town Treasurer] to discuss this notice." (*Id.*) By the time Mr. Dean was sent the January 2013 notice, however, DHHS had already sold the property to James Taylor.

Whether DHHS could have addressed Mr. Dean's situation without selling the Owls Head property is a central contested point. The Town of Owls Head had in place certain policies and procedures to abate foreclosures due to overdue taxes. (Ex. 8 to Pl.s' Opp. S.M.F., Article 12.) The policy provided:

> Poverty Property Tax Abatements...The Town of Owls Head desires an alternative to forcing the sale of property in order to collect taxes from those otherwise unable to pay.
>
> The Selectmen of Owls Head hereby outline the conditions upon which poverty abatements will be granted...Persons desiring an abatement must complete an Application for a Poverty Abatement of Property Taxes and must complete a General Assistance application form. Applicants which are requesting abatements for previous tax years must demonstrate no ability to contribute to the public charge, both currently and during the tax year or years for which the abatement is requested....

(Ex. 8 to Pl.s' Opp. S.M.F., Article 12.) Mr. Dean's ability to meet these requirements, had an abatement application been filed, is uncertain: prior to being committed to DPPC, he had withdrawn approximately $244,000 from a trust fund established by his mother, but could not account for what he did with the money. (DHHS's A.S.M.F. ¶ 60; *see* Perry Dep. 79:11-86:20.) In any event, DHHS did not explore the abatement avenue on his behalf.

9

On September 11, 2012, Ms. Archer requested authority from her supervisor to obtain legal assistance from Attorney Cardone because "there are questions about proper notification and there is now a family member interested in serving as guardian/conservator. This is a very contentious family matter involving money and property. It may get very complicated." (*Id.* ¶ 92.) On September 28, 2012, Ms. Archer's supervisor emailed Assistant Attorney General Kathryn Greason to confirm that Attorney Cardone's representation had been authorized and that her assistance with the disposition of Mr. Dean's car would be required. (*Id.* ¶ 96.)

On or about October 19, 2012, attorney Anita Volpe entered an appearance in the Probate Court for Ms. Perry and filed an objection to DHHS's Petition. (Ex.s I & J to Archer Aff.) Attorney Volpe's objection requested the Probate Court to continue DHHS's temporary conservatorship "until such time as the Court may hear and rule upon a family member's competing Joint Petition[.]" (Ex. J. to Archer Aff., at 2.)

On November 1, 2012, DHHS amended its petition with the Probate Court to also seek appointment as Mr. Dean's temporary guardian due to deterioration in his mental health. (Dean's Supp. S.M.F. ¶ 20.) DHHS was appointed as Mr. Dean's temporary guardian the following day. (*Id.* ¶ 22.)

On December 21, 2012, Claire Perry and Pamela Vose filed a joint petition for Ms. Vose to be appointed as Mr. Dean's guardian and conservator. (Def.s' Supp. S.M.F. ¶ 46.) Neither at that time nor at any time prior to March 1, 2013, however, did Ms. Perry or Ms. Vose request to have DHHS's temporary conservatorship terminated. (*Id.* ¶ 49.)

On June 19, 2013, after its temporary conservatorship expired, DHHS moved to dismiss its petition to be appointed Mr. Dean's guardian and conservator and took no position as to any other pending petitions for guardianship or conservatorship. (*Id.* ¶ 50.) On August 1, 2013,

10

the Probate Court appointed Ms. Vose as Mr. Dean's conservator and dismissed DHHS's petition. (*Id.* ¶ 52.) Mr. Dean remained incapacitated and in need of a conservator until at least August 1, 2013. (Pl.s' A.S.M.F. ¶ 220.)

B.    Sale of the Owls Head Cottage

On September 19, 2012, DHHS, through David Vaughan, an estate management specialist with DHHS, retained an appraiser, Sarah Robertson, to appraise the Owl's Head cottage. (Def.s' Supp. S.M.F. ¶ 55.) In a report dated October 12, 2012, she opined that the property's value was $340,000. (*Id.*) The report further stated that "[c]urrently, sales appear to be steady in the subject markets, with similar type properties having an exposure time of 3-6 months." (Dean's Supp. S.M.F. ¶ 16.) The report also provided: "Locations of septic unknown. According to [Ms. Perry] the subject has a cesspool which is still functioning. There is no well located on the subject property . . ." (*Id.* ¶ 17.) Subsequently, DHHS hired realtor Kathryn Baxter to market the property. (Def.s' Supp. S.M.F. ¶ 57.)

On October 12, Attorney Volpe sent an email to Mr. Vaughan stating that she was hopeful members of Mr. Dean's family would be able to put together sufficient resources to pay the real estate taxes due on the Owls Head cottage. (Ex. 29 to Pl.s' Opp. S.M.F.) Attorney Volpe also asked Mr. Vaughan his thoughts about getting the taxes paid and then listing the property in the spring. (*Id.*) Mr. Vaughan responded that "[t]here is a need to proceed with the sale, since besides the overdue taxes on both properties there is no income for meeting day-to-day needs." (*Id.*)

Ms. Baxter asserts that she listed the Owls Head cottage for sale on November 7, 2012 for $340,000, although a listing service indicates it was not listed until November 9, 2012. (Baxter Dep. 36:2-7; Ex. 11 to Pl.s' Opp. S.M.F.) On November 12, 2012, Ms. Perry sent an email acknowledging that the cottage had been listed. (Def.s' Supp. S.M.F. ¶ 59.) The

11

following day, Ms. Baxter sent an email to DHHS opining that the condition of the cottage and the tax lien will make the property a hard sell and that the price should be lowered if there are no showings within the next 10 days. (Ex. 12 to Pl.s' Opp. S.M.F.)

Between November 7 and November 21, there were no inquiries about the property and there were no showings. (Def.s' Supp. S.M.F. ¶ 61.) On November 21, Ms. Baxter—at the direction of Mr. Vaughan—reduced the asking price to $299,900.[5] (Baxter Dep. 36:15-23; Ex. 13 to Pl.s' Opp. S.M.F.) On December 6, 2012, Mr. Vaughan filed an "Inventory" of Mr. Dean's estate with the Probate Court, which reported the fair market value of the Owls Head cottage as $340,000. (Dean's Supp. S.M.F. ¶ 26.)

Ms. Baxter testified that she received an offer for $150,000 on November 25, 2012. (Baxter Dep. 12:21-23.) Two days later, Ms. Baxter countered with $289,000, but the potential buyer did not express further interest in the property. (Def.s' Supp. S.M.F. ¶ 64.) On December 7, James Taylor offered $150,000. (Id. ¶ 65.) Ms. Baxter countered with $289,000, and Mr. Taylor responded with an offer for $180,000 on December 10. (Id. ¶ 66.) On December 11, 2012, Ms. Baxter forwarded her correspondence with Mr. Taylor's broker to Mr. Vaughan. (Dean's Supp. S.M.F. ¶ 29.) Mr. Vaughan, in turn, shared the email with Ms. Archer. (Id. ¶ 30.) Forty-three minutes after the email was sent, Ms. Archer replied "[s]ell the thing for whatever we can get and put us all out of our misery! I can hear the foreclosure clock ticking...." (Id. ¶ 31.)

On December 11, 2012, Ms. Baxter emailed Mr. Vaughan stating that now that she had received two offers below $200,000, she wanted to talk with Ms. Robertson about the factors underlying her appraisal, but Ms. Robertson would not talk to her without Mr. Vaughan's

---

[5] There are competing facts indicating that the price was lowered to $299,900 instead of $299,000. For purposes of the present motions, the $900 discrepancy is irrelevant.

authorization.[6] (*Id.* ¶ 67.) Mr. Vaughan provided Ms. Robertson said authorization. (*Id.* ¶ 68.) On December 17, Ms. Baxter allegedly called Mr. Vaughan and told him that Ms. Robertson had said that her appraisal assumed a satisfactory well and septic system, and a marketing time of three to six months. (Ex. D to Baxter Dep.; Vaughan Aff. ¶ 6.) Ms. Baxter also allegedly told Mr. Vaughan that Ms. Robertson said $30,000 could be deducted from the appraisal because it did not have a well or septic system. (Ex. D to Baxter Dep.; Vaughan Aff. ¶ 7.) Ms. Robertson further allegedly told Ms. Baxter that if the house had to be sold before February 2013 to avoid foreclosure, there could be a 30% reduction for the abbreviated marketing time. (Ex. D to Baxter Dep.; Vaughan Aff. ¶ 8.)

A supplemental addendum to Ms. Robertson's appraisal report indicates that the absence of a well was already factored into her appraisal of the Owls Head cottage: it says there is "no well located on the subject property . . ." (Ex. 15 to Pl.s' Opp. S.M.F.) In addition, a November 8, 2012 email to Ms. Baxter states that the Owls Head cottage has a "shared well" and that the "buyer will most likely have to drill a new well." (Ex. 16 to Pl.s' Opp. S.M.F.) Furthermore, Ms. Robertson stated that the presence of a well on the property was "small peanuts," and denied that she told Ms. Baxter that $30,000 could be deducted from the value of the property because it had no well and no septic. (Ex. 18 to Pl.s' Opp. S.M.F., Robertson Dep.: 14:4-15:11, 18:3-6.) Ms. Robertson also explained that she told Ms. Baxter:

> [L]iquidation companies tend to reduce properties by 30 percent when they want a fast sale, typically like in REO property, or real estate owned or bank owned property, that sometimes that's what banks will do to move a property quickly.

---

[6] At her deposition, Ms. Baxter stated that marketing the Owls Head cottage was a challenge because: 1) the property was in a "deplorable condition;" 2) there was a large crack in the foundation that could lead a prospective buyer to believe the building was unstable; 3) there was a big leak above the roof line that resulted in water pouring into the kitchen and caused mold to grow; 4) interior upgrades were in a poor condition and of poor workmanship; 5) the neighboring property had a "derelict building with huge mounds of rat housing and filth; 6) there was no well or septic system; and 7) there were fallen trees on the property that had to be cleaned up. (Baxter Dep., 30:21-32:20.)

And [Ms. Baxter] also asked me about why if she had just listed the property it hadn't sold yet at the price that I appraised it at. And that's when I explained to her that it was – the appraisal is based on a three – to six months exposure period.

(*Id.* at 18:11-20.) Ms. Robertson further opined that the sale of the Owls Head cottage for only $205,000 caused her to question whether it was an arm's length transaction. (*Id.* at 18:21-19:18.)

Following Ms. Baxter's conversations with Ms. Robertson, she countered Mr. Taylor's $180,000. (*See* Def.s' Supp. S.M.F. ¶ 73.) On December 20, 2012, Mr. Taylor made a "final top offer" of $205,000. (Dean's Supp. S.M.F. ¶ 35.) Mr. Vaughan forwarded the offer and email to Ms. Archer the following day with a message inviting her thoughts. (*Id.* ¶ 36.) On December 26, 2012, Ms. Archer replied "SELL!!!" (*Id.* ¶ 42.) Mr. Vaughan, however, would not sign the purchase and sale agreement for the Owls Head cottage until the sale price of $205,000 was authorized by the Asset Disposition Committee." (*Id.* ¶ 37.)

On December 21, Mr. Vaughan entered a case note providing: "Addendum written and circulated to asset disposition committee because the terms of the P & S vary significantly from the representation in the original asset disposition request." (*Id.* ¶ 38.) The Asset Disposition Committee authorized the sale of the property for $205,000. (*Id.* ¶ 40.) In explaining why the cottage was sold for $205,000, Mr. Vaughan stated in the temporary conservator's final account filed on June 27, 2013: "Loss due to limited time for marketing; difficulty marketing in winter/holiday season; well/septic challenges." (*Id.* ¶ 41.)

The closing for the Owls Head cottage was originally scheduled for January 11, 2013. (Def.s' Supp. S.M.F. ¶ 76.) On January 9, 2013, Attorney Cardone received a phone call from attorney Wayne Doane stating that he was going to represent Mr. Dean and would be filing a motion for a temporary restraining order to stop the closing. (*Id.* ¶¶ 77-78.) Attorney Cardone immediately called Ms. Archer and her supervisor. (*Id.* ¶ 79.) Both Ms. Archer and

14

her supervisor were out of the office, so Attorney Cardone called the Office of the Attorney General and left a message for AAG Greason. (*Id.* ¶ 80.) AAG Greason's supervisor returned Attorney Cardone's call, and the two agreed that the closing should not take place until they had more information. (*Id.* ¶¶ 81-82.)

Later on January 9, Attorney Cardone asserts that she spoke with Ms. Archer, who informed her that Mr. Dean was not opposed to the sale of the Owls Head cottage and that the sale should take place quickly to avoid foreclosure on February 12, 2013. (Cardone Aff. ¶ 9.) Attorney Cardone asserts that she also spoke with Mr. Vaughan, who confirmed the information Ms. Archer allegedly provided. (*Id.* ¶ 10.) Mr. Vaughan allegedly told Attorney Cardone that the appraisal of the property, as discounted for the lack of a septic system and well, along with the abbreviated marking period, was $217,000 and the sale price was $205,000. (*Id.* ¶ 11.) Attorney Cardone claims that she had no other information regarding the value of the Owls Head cottage or the circumstances of its sale. (*Id.* ¶ 12.) Attorney Cardone instructed Mr. Vaughan to alert Mr. Taylor that the sale might have to be postponed if the Probate Court issued a restraining order. (Def.s' Supp. S.M.F. ¶ 87.)

On January 10, 2013, Mr. Vaughan called Attorney Cardone to tell her that the buyer could close that day and asked whether that would be O.K. (*Id.* ¶ 89.) Attorney Cardone contacted the Probate Court and was told that no TRO motion had been filed. (*Id.* ¶ 90.) Attorney Cardone asserts that she attempted to reach Attorney Doane and left a message stating that the closing would occur that day. (Cardone Aff. ¶ 16.) Attorney Cardone claims she was concerned it could be months before a TRO motion would be heard and, if such delay occurred, the Owls Head cottage could be lost through foreclosure. (*Id.* ¶ 18.) After speaking with the Probate Court and leaving a message for Attorney Doane, Attorney Cardone told Mr. Vaughan that he could proceed with the closing that day. (Def.s' Supp. S.M.F. ¶ 93.) Later

15

that day, Mr. Vaughan called Attorney Cardone to inform her that the sale had been closed. (*Id.* ¶ 94.)

Attorney Cardone asserts that an hour or two after the closing, a Probate Court clerk called to tell her that a TRO motion had just been filed. (Cardone Aff. ¶ 21.) The TRO motion was brought by Ms. Perry to enjoin DHHS from selling the Owls Head cottage and Mr. Dean's Rockland house. (Def.s' Supp. S.M.F. ¶ 96.) The Probate Court held a hearing on the motion on January 25, 2013. (*Id.* ¶ 97.) The sale of the Owls Head cottage was considered moot because it had already occurred. (*See id.* ¶ 98; Ex. 31 to Pl.s' Opp. S.M.F., p. 4:15-5:10.) The sale of the Owls Head cottage resulted in DHHS obtaining the net sum of $178,945.71. (Pl.s' A.S.M.F. ¶ 71.)

Before DHHS through Mr. Vaughan executed a Conservator's Deed transferring the Owls Head property on January 10, 2013, DHHS as Mr. Dean's public conservator did not estimate or compute the capital gains tax liability that the sale of the cottage would incur for Mr. Dean's estate. (Dean's Supp. S.M.F. ¶ 48.) The capital gains tax owed to the IRS and Maine Revenue Service from the sale of the cottage totaled $31,674, with interest and penalties raising the total to $37,972.02. (*Id.* ¶ 52.)

Terri S. Mackenzie, a certified Residential Appraiser, opined in a January 30, 2015 appraisal, that the market value of Mr. Dean's Owls Head cottage as of January 10, 2013 was $205,000.[7] (Ex. A to DHHS's A.S.M.F.) Alix Cohen, an appraiser retained by Ms. Perry, recommended listing the Owls Head cottage in the $285,000 to $295,000 range and projected a final sale price in the $250,000 range. (Perry Dep. 118:22-119:4, 174:2-11.)

---

[7] Mr. Taylor designated Ms. Mackenzie as an expert witness on January 30, 2015.

C.    The Rockland House

On October 1, 2012, DHHS, through Ms. Archer, notified Ms. Perry that the Rockland house had been secured and that only DHHS would have access to it. (Pl.s' A.S.M.F. ¶ 164.)

On October 16, Mr. Vaughan visited Mr. Dean's Rockland house and found a notice from the local water company stating that water service had been disconnected for nonpayment of bills. (Vaughan Aff. ¶ 31.) The notice further provided that "[i]f service was not disconnected, your account will be charged a $20.00 collection fee." (Ex. C to Vaughan Aff.) Mr. Vaughan checked the kitchen faucet, but no water came out. (Vaughan Aff. ¶ 32.) Mr. Vaughan assumed that the water to the Rockland house had been disconnected, and neither he nor anyone else at DHHS took any further steps to make sure the water supply was shut off. (*Id.*)

Mr. Vaughan visited the Rockland house again six weeks later, on December 4, 2012, and discovered that a water pipe had burst and was discharging water into the house. (Vaughan Aff. ¶ 33.) Plaintiffs contend that tens of thousands of gallons had filled the house. Prior to December 4, 2012, there were at least eight days during which the minimum temperature was below 32 degrees Fahrenheit. (Pl.s' A.S.M.F. ¶ 169.)

Mr. Vaughan immediately arranged for the water to be shut off. (Def.s' Supp. S.M.F. ¶ 129.) However, for reasons unexplained in the record, DHHS apparently did nothing to have the water drained or dry the interior of the house, or otherwise to mitigate the extensive damage resulting from the burst pipe. (Ex. 39 to Pl.s' Opp. S.M.F., RFA 67.)

On December 10, Mr. Vaughan scheduled an appointment with Ms. Baxter to list the Rockland house for sale. (Pl.s' A.S.M.F. ¶ 175.) On that same day, Mr. Vaughan emailed AAG Greason stating that "[i]t is important that any items of value be removed promptly from the Rockland house." (*Id.* ¶ 176.) On December 12, 2012, Mr. Vaughan signed a listing contract

with Ms. Baxter. (*Id.* ¶ 177.) The Rockland house was subsequently listed for $69,000, even though it had previously been reported as having a tax-assessed value of $177,200. (*Id.* ¶ 181.) By email dated December 13, Dr. Burk advised Ms. Archer that Mr. Dean wished to return to his Rockland house for at least a little while and asked, "What is the barrier to selling the Owl's [sic] Head property so that Bill will have the money to repair his house and make it habitable." (*Id.* ¶ 182.) Ms. Archer replied that "[l]iving in the Rockland house *needs to be permanently taken off the table.*" (*Id.*) (emphasis in original.)

On January 14, 2013, Ms. Perry filed a Notice of Pending Litigation in the Knox County Registry of Deeds. (Pl.s' A.S.M.F. ¶ 186; Def.s' Opp. to Pl.s' A.S.M.F. ¶ 186.) As previously mentioned, the Knox County Probate Court convened a hearing January 25, 2013 on Ms. Perry's and Mr. Dean's effort to halt the sales of both properties. Plaintiffs assert that Attorney Cardone made several misstatements at the hearing. Those assertions include: 1) Attorney Cardone's statement implying that the Rockland house was "under contract" (Ex. 55 to Pl.s' A.S.M.F., p. 2); 2) that the issue of needing to sell the Rockland house was addressed at the September 6, 2012 hearing appointing DHHS as temporary conservator and that it was not "just something that has come since and [DHHS] is taking the initiative" (*Id.* at 8); and 3) that Mr. Dean "is in favor of what [DHHS is] doing." (*Id.* at 9.) Plaintiffs also assert that Attorney Cardone allowed Ms. Archer to make the following misrepresentations at the January 25 Hearing: 1) that the Rockland house has not been maintained as illustrated by the water pipes bursting—implying that the burst water pipe was due to Mr. Dean's faulty maintenance (*Id.* at 10); 2) that DHHS had a separate appraisal of the Rockland house carried out valuing it at $65,000 (*Id.* at 10-11); 3) that Ms. Perry and her attorney at the time, Anita Volpe, were both notified of the September 6, 2012 hearing in which DHHS was appointed as temporary

18

conservator (*Id.* at 15); and 4) that Ms. Perry and Attorney Volpe were notified when DHHS sought a temporary guardianship due to Mr. Dean's deteriorating medical condition (*Id.*).

Based at least in part on Ms. Archer's representation about an appraisal showing the Rockland house had a fair market value of $65,000, the Probate Court made a finding of fact that "the proposed sale is commercially reasonable and reasonably calculated to realize the best price based on fair market value." (Pl.'s A.S.M.F. ¶ 193; Def.s' Opp. to Pl.s' A.S.M.F. ¶ 193.)

Attorney Cardone asserts that, before the hearing on Ms. Perry's TRO on January 25, 2013, she had not been aware that a water pipe had burst at Mr. Dean's Rockland house. (Cardone Aff. ¶¶ 27-28.) After the January 25 hearing, the Probate Court issued an order denying the TRO motion. (Ex. B to Cardone Aff.) Later on January 25, 2013, Mr. Hardy, Direct of Estate Management Services at DHHS, executed a Purchase and Sale Agreement for $65,000 for the Rockland house. (Pl.s' A.S.M.F. ¶ 194.) Ms. Vose and Ms. Perry, through their attorney David Jenny, moved to amend findings and later the Probate Court's judgment. (Ex. C to Cardone Aff.) On February 15, 2013, the Probate Court appointed attorney Joseph P. Belisle to represent Mr. Dean in the probate proceedings.[8] (Def.s' Supp. S.M.F. ¶ 103.)

On February 12, 2013, Ms. Archer emailed Dr. Burk to let her know that DHHS decided to hold off on the sale of the Rockland house until after a hearing scheduled for February 22, 2013. (*Id.* ¶ 200.) DHHS decided to hold off because the buyer was worried about Ms. Perry's opposition and was willing to wait for the outcome of the hearing. (*Id.*)

---

[8] Specifically, the order provided:

> The Court hereby appoints Joseph B. Belisle, Esquire…to act as…Attorney in a probate proceeding under the Probate Court. The nature of this proceeding is: Joined Petitions: Appointment of Guardian and Conservator (2012-598-0); Temporary Guardianship; Joined Petitions; Appointment of Guardian and Conservator (2012-598-1); Petition for Emergency Hearing and Order Relating to the Proposed Sale of the Protected Person's Assets by the Temporary Conservator/Guardian (2012-598-2)…and the reasons for this appointment are: to represent William T. Dean, Jr. in said proceedings."

(Ex. D to Cardone Aff.)

On February 20, 2013, Attorney Cardone filed a motion to clarify that the Probate Court's January 25 Order applied to the Rockland house because the Order did not specifically refer to the Rockland house. (Ex. E to Cardone Aff.) The motion stated that it sought the clarification so that it would remove any cloud on the title of the Rockland house and allow DHHS to close the sale of that house before its temporary conservatorship expired on March 6, 2013. (*Id.*) Mr. Jenny asserts that he never received a copy of that motion. (Jenny Aff. ¶ 29.) On February 21, 2013, the motion to clarify was granted. (Ex. E to Cardone Aff.)

On March 1, 2013, however, DHHS's plan to close the sale of the Rockland house was again delayed by the potential buyer's concern that the January 25, 2013 Order misidentified the Rockland Property. (Pl.s' A.S.M.F. ¶ 212.) An attorney for the potential buyer sent an email on March 4, 2013 relating that Attorney Cardone left him a message stating that she met with the new Probate Judge, M. Ray Bradford, Jr., on March 1, 2013 "in an effort to expedite a decision in this matter. The Judge was not willing to do so as it was his first day on the job." (Ex. 63 to Pl.s' A.S.M.F.)

On March 6, 2013, DHHS's six-month temporary conservatorship expired without DHHS completing the sale of the Rockland house. (Def.s' Supp. S.M.F. ¶ 104.) On March 21, 2013, the Probate Court dismissed the motion to enjoin the sale of the Rockland house as moot because DHHS's temporary conservatorship had expired and the sale had not occurred. (*See* Def.s' Supp. S.M.F. ¶ 105.)

D.     Personal Property in the Rockland House and Owls Head Cottage

DHHS, through Mr. Vaughan, retained a licensed auctioneer, David Thistle, to inspect the contents of the Rockland house, identify and catalog all sellable items, and then use his best efforts to sell said items. (Vaughan Aff. ¶ 21; Thistle Dep. 17:9-18, 24:11-17.)

20

Mr. Vaughan asserted that he reached an oral agreement with Mr. Thistle to pay him through a 35% commission. (Vaughan Dep. 161:10-163:10.) Mr. Thistle, however, testified that he never talked with Mr. Vaughan about how much he would be paid and considered himself free to set his own compensation, between 30% and 50% for each item that he sold. (Thistle Dep. 24:18-26:18.) No duly designated agent of DHHS prepared a written list or inventory of personal property located at Mr. Dean's Rockland house before Mr. Thistle started removing marketable items from the location. (Pl.s' A.S.M.F. ¶ 128.) Mr. Thistle's records indicate that he did not sell any items until after the sale of the Owls Head cottage. (Ex.s 33 & 34 to Pl.s' Opp. S.M.F.)

According to the Plaintiffs, in approximately 2010, Ms. Perry had reached an agreement with Mr. Dean that she could use and occupy the Owls Head cottage until Mr. Dean could pay her at least half of the amount he depleted from the family trust fund. (Pl.s' A.S.M.F. ¶¶ 17-22.) Ms. Perry accepted the payments, occupied the Owls Head cottage seasonally for two years, and refrained from taking legal action against Mr. Dean until after DHHS sold the cottage. (*Id.* ¶ 23.) On November 6, 2012, DHHS locked Ms. Perry out of the Owls Head cottage. (Pl.s' A.S.M.F. ¶ 90.)

On November 30, attorney Jenny sent a letter to AAG Greason explaining Mr. Dean's agreement with Ms. Perry regarding her use of the cottage. (*Id.* ¶ 80.) The letter provided the names of individuals who could be contacted to verify Ms. Perry's ownership of property in the cottage. (Ex. B to Jenny Aff, p 2.) DHHS did not interview any of the individuals identified prior to excluding Ms. Perry from the cottage. (*See* Vaughan Dep. 108:1-14; Def.s' Opp. to Pl.s' A.S.M.F. ¶ 86.)

Ms. Perry informed DHHS that much of the personal property in the Owls Head cottage belonged to her. (Def.s' Supp. S.M.F. ¶ 111.) On December 4, 2012, DHHS gave Ms.

21

Perry about three hours to remove all of the property she claimed as hers from the cottage. (7/27/15 Perry Aff. ¶ 32; Vaughan Aff. ¶ 25.) Ms. Perry claims that she was not given adequate time to remove her property and had to leave multiple pieces of property behind, but does not indicate when she informed DHHS that she had not been able to remove all of her property. (Vaughan Aff. ¶ 26; 7/27/15 Perry Aff. ¶¶ 32, 33, 39.) By letter dated November 29, 2012, DHHS, through AAG Greason, acknowledged that some, if not most, of the personal property located at the Rockland house belonged to the Estate of Alice H. Dean, Ms. Perry and Mr. Dean's deceased mother. (Pl.s' A.S.M.F. ¶ 135.)

Throughout the fall, winter and early spring of 2012-2013, Ms. Thistle made at least ten trips to the Rockland house and removed ten pick-up truck loads of Mr. Dean's personal property. (*Id.* ¶ 132.) Mr. Thistle sold some items, but DHHS's temporary conservatorship ended before all items were sold. (*See id.*) Ms. Perry's childhood bedroom set of furniture was among the items sold by Mr. Thistle. (*Id.* ¶ 138.)

On December 6, 2012, Mr. Vaughan filed an inventory of the conservatorship estate of Mr. Dean, but only provided notice of the inventory to Ms. Archer. (*Id.* ¶¶ 145-146.) The value of Mr. Dean's personal property (household contents) was reported as $2,500 based on Mr. Vaughan's request that Mr. Thistle provide him with a conservative estimate of net value. (*Id.* ¶ 148.) The Dean family's conservative estimate of the value of the personal property in the Rockland house is $26,530. (7/27/15 Perry Aff. ¶ 38.)

At the time DHHS prepared its inventory, a concert organ was included in the list of items, but its value was not included because it was not known if it was marketable. (Ex. 34 to Pl.s' A.S.M.F.) The organ retailed for $24,000, but DHHS never corrected its estimate of household contents. (Pl.s' A.S.M.F. ¶ 152.) Mr. Thistle took possession of the organ and planned to sell it for $8,000. (*Id.* ¶ 154.)

22

Mr. Vaughan asked Mr. Thistle to return all unsold items following the end of DHHS's temporary conservatorship. (Def.s' Supp. S.M.F. ¶ 108) Mr. Vaughan claims to have asked Mr. Thistle to make a separate list of all items he had sold and all items he had returned. (Vaughan Aff. ¶ 23.) Mr. Thistle made arrangements with Mr. Dean's then attorney, Mr. Belisle, to transport the unsold items to a storage facility and provided Mr. Vaughan with lists of sold and returned items. (Thistle Dep. 56:6-59:9; Vaughan Aff. ¶ 23.)

E.      Caterpillar the Cat

After DHHS was appointed as Mr. Dean's temporary conservator, Ms. Archer learned that Mr. Dean had a cat. (Archer Aff. ¶ 22.) The cat, Caterpillar, was approximately 12 years old. (Def.s' Supp. S.M.F. ¶ 115.) On September 28, 2012, Ms. Archer arranged for Caterpillar to see a veterinarian. (Archer Aff. ¶ 23.) Prior to visiting the veterinarian, Ms. Archer stated that if Caterpillar was sick "and we can justify putting it down we will have that done." (Pl.s' A.S.M.F. ¶ 103.) Ms. Archer expressed concerns "about putting it down if it is not sick as Claire might use this in some negative way at [sic] Court hearing." (Id. ¶ 104.)

The veterinarian allegedly advised Ms. Archer that Caterpillar was in poor shape and recommended that he be euthanized. (Archer Aff. ¶ 24.) Ms. Perry asserts that the veterinarian's recommendation was based in part on Ms. Archer's representations that Mr. Dean was elderly, unlikely to live on his own again, and that no one was able and willing to care for Caterpillar. (Perry. Supp. Aff. ¶ 25.) Prior to visiting the veterinarian, Ms. Archer had asked Ms. Perry and Mr. Dean's friend, Steve Mahoney, whether they would be willing to care for Caterpillar, but both declined. (Archer Aff. ¶ 25.) Ms. Perry claims that she was not informed the alternative was to euthanize Caterpillar and that, had she known this, she would have taken him in. (Perry. Supp. Aff. ¶¶ 26-27.)

23

On October 1, 2012, Ms. Archer met with Mr. Dean to discuss Caterpillar and obtained Mr. Dean's signature on a letter authorizing Caterpillar's euthanization. (Archer Aff. ¶ 26 and Exhibit M thereto.) After the fact, Mr. Dean expressed surprise that he signed the letter explaining that he couldn't "imagine…doing this without some consultation with either my cousin or my sister. I loved that cat." (Dean. Dep. 82:7-83:11.) Thereafter, Ms. Archer, as well as her supervisor, signed the letter and sent it to the veterinary hospital. (Def.s' Supp. S.M.F. ¶ 120.) The veterinary hospital euthanized Caterpillar later on October 1. (*Id.* ¶ 121.)

F.     Mr. Dean's Cadillac

While acting as Mr. Dean's conservator, DHHS arranged for the sale of Mr. Dean's 2000 Cadillac Eldorado. (Def.s' Supp. S.M.F. ¶ 122.) Ms. Archer alleges that she discussed selling the car with Mr. Dean and that he was in agreement to proceed with the sale. (Pl.s' A.S.M.F. ¶ 119.) Mr. Dean, however, has no recollection of the conversation. (*Id.* ¶ 120.)

Mr. Vaughan estimated that the Cadillac had 150,000 miles on it. (Ex. 36 to Pl.s' Opp. S.M.F.) Mr. Vaughan had the car towed to Port City Auto Auctions, where it was offered at five separate auctions. (Def.s' Supp. S.M.F. ¶ 123.) The highest offer, made at the fifth auction, was for $900. (*Id.* ¶ 124.) Port City recommended that DHHS accept the offer. (*Id.* ¶ 124.) Mr. Vaughan authorized Port City to accept the $900 offer, which netted Mr. Dean $385. (*Id.* ¶ 125; Ex. B to Vaughan Aff.)

## II. *Analysis*

The undisputed facts suggest that the effects of DHHS's management of Mr. Dean's affairs during what was supposed to be a temporary conservatorship were anything but temporary. In the span of six months, most of what Mr. Dean owned and valued wound up being sold off, flooded or euthanized, as a result of DHHS's intervention on his behalf. It seems clear that, had DHHS as Mr. Dean's public conservator pursued a strategy aimed more

24

at conserving his assets temporarily (and winterizing them effectively) rather than liquidating them permanently, Mr. Dean would be much better off today.

For example, the record before the court plainly suggests that DHHS, as Mr. Dean's public conservator, failed to explore, in any meaningful way, alternatives to selling Mr. Dean's Owls Head property. One alternative that should at least have been attempted was to seek a property tax abatement on behalf of Mr. Dean. Another alternative would have been to borrow against either of Mr. Dean's two properties. Neither of Mr. Dean's properties was encumbered with any mortgage debt whatsoever. A third alternative to sale would have been to sell enough of Mr. Dean's personal property to generate funds to pay the Owls Head taxes. As noted above, Mr. Dean's organ, for example, retailed at $24,000 and was worth $8,000, according to DHHS's retained auctioneer, Mr. Thistle.

In DHHS's defense, it must be noted that the record contains evidence that the Owls Head cottage was run down and would have required a substantial investment to be put into good condition. It is also clear that DHHS took the steps it did to sell his property in an effort to avoid what it saw as the potentially greater loss associated with a tax lien foreclosure. Also, although the Plaintiffs have freely made accusations of dark motives and malfeasance on the part of the individual State Defendants, there is no admissible evidence that DHHS or any of the individual State Defendants was actually motivated by malice or personal gain at Mr. Dean's or Ms. Perry's expense.

The largely undisputed facts, viewed in a light favorable to the Plaintiffs, indicate that DHHS, as Mr. Dean's public conservator, developed and implemented an aggressive plan on his behalf without adequately exploring alternatives, and that, in doing so, DHHS failed to attend to important details. In these significant respects, Mr. Dean has made a prima facie showing that DHHS breached its fiduciary duty, as Mr. Dean's conservator, to act in Mr. Dean's best

interests.  However, DHHS and the individual State Defendants have raised substantial legitimate defenses to the Plaintiffs' claims.

The State Defendants first argue that Plaintiffs' tort claims against DHHS, Ms. Archer and Mr. Vaughan are barred because Plaintiffs did not comply with the notice requirements of the Maine Torts Claims Act.   They next assert that even if Plaintiffs had complied with the notice requirements, their tort claims against DHHS are barred because they do not fit within an exception to DHHS's general immunity.  Third, the State Defendants argue that the tort claims against Ms. Archer and Mr. Vaughan are barred because they are entitled to discretionary function immunity.  Fourth, the State Defendants argue that even if the individual defendants are not entitled to immunity, summary judgment is warranted against the Plaintiffs' tort claims because the undisputed facts demonstrate that Ms. Archer, Mr. Vaughan, and Attorney Cardone did not commit any torts.  Fifth, the State Defendants argue that Plaintiffs have not stated a claim against DHHS under the Maine Civil Rights Act because that statute does not authorize suit against the State and, by extension, DHHS.  Finally, the State Defendants argue that summary judgment is warranted against Plaintiffs' 42 U.S.C. § 1983 claims because the individual defendants did not violate any clearly established federal laws.

"The function of a summary judgment is to permit a court, prior to trial, to determine whether there exists a triable issue of fact or whether the question[s] before the court [are] solely…of law." *Bouchard v. American Orthodontics*, 661 A.2d 1143, 44 (Me. 1995). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653.  A "material fact" is one that can affect the outcome of the case, and a genuine issue exists when there is sufficient evidence for a fact finder

26

to choose between competing versions of the fact. *Lougee Conservancy v. City-Mortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774.

Summary judgment is also appropriate if, looking at the record in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, no reasonable juror could find for the non-moving party. *Id.* ¶ 14, n. 3 (quoting *Scott v. Harris*, 550 U.S. 372, 377 (2007)). This is true "even when concepts such as motive or intent are at issue…if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Dyer. v. Dep't. of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821 (quoting *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007)); *Bouchard*, 661 A.2d at 1144-45 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted"). Accordingly, a "judgment as a matter of law in a defendant's favor is proper when any jury verdict for the plaintiff would be based on conjecture or speculation." *Stanton v. Univ. of Maine System*, 2001 ME 96, ¶ 6, 773 A.2d 1045.

Motions for summary judgment must be supported by citations to record evidence of a quality that would be admissible at trial. *Levine*, 2001 ME 77, ¶ 6, 770 A.2d at 656 (citing M.R. Civ. P. 56(e). Facts supported by record citations in a supporting or opposing statement of materials facts are deemed admitted unless properly controverted. M.R. Civ. P. 56(h)(4); *see also Farrell v. Theriault*, 464 A.2d 188, 194 (Me. 1983). When ruling on a motion for summary judgment, courts are only required to consider "the portions of the record referred to, and the material facts set forth, in the parties' statement of material facts to determine whether there is no genuine dispute of material fact." *Lubar v. Connelly*, 2014 ME 17, ¶ 34, 86 A.3d. 642.

27

A.    Whether DHHS Itself is Immune from Plaintiffs' Causes of Action

This section evaluates DHHS's sovereign immunity defense as to the Plaintiffs' claims against it. Later sections evaluate the immunity claims of the individual State Defendants.

The State Defendants argue Plaintiffs' tort claims against DHHS are barred because the Legislature has not waived DHHS's sovereign immunity. They explain that immunity is the rule and there is no exception for claims arising from interference with a contract or expectancy, a failure to properly winterize a conservatee's home, or the breach of a fiduciary duty to a conservatee. They also contend that summary judgment is warranted against Mr. Dean's claim for the negligent discharge of pollutants because water is not a pollutant within the meaning of the statutory exception to sovereign immunity provided in 14 M.R.S.A. § 8104-A(3).

Plaintiffs respond that DHHS is not immune because their tort claims are not subject to the Maine Tort Claims Act. First, they argue that Ms. Perry's claim for interference with contract or expectancy sounds in contract, not tort. Second, they contend that their claims for breach of fiduciary duty are governed by the Maine Probate Code, not barred by the Maine Tort Claims Act, because the Probate Code explicitly provides that public conservators are liable for torts such as breach of fiduciary duty. Plaintiffs also point to the Probate Code's bonding requirement for public conservators as evidence that the Legislature waived DHHS's immunity for claims brought against DHHS as public conservator under the Probate Code.

The analysis turns to each of the Plaintiffs' arguments that their claims against DHHS fit within waivers of sovereign immunity.

1)    *Whether Mr. Dean's Claim for Negligent Discharge of Pollutants Fits Within 14 M.R.S.A. § 8104-A(3)'s Exception to Sovereign Immunity.*

Mr. Dean alleges that the burst water pipe at the Rockland house constitutes a tort within the meaning of the Maine Tort Claims Act provision waiving immunity as to liability

28

for negligent discharge of pollutants, 14 M.R.S.A. § 8104-A(3). Section 8104-A(3), titled "discharge of pollutants," is an exception to the general rule of governmental immunity, providing that:

> A governmental entity is liable for its negligent acts or omissions in the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalines, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but only to the extent that the discharge, dispersal, release or escape complained of is sudden and accidental.

*Id.*

"Waivers [of immunity] are not generally implied and even explicit waivers are construed narrowly." *Id.* (citing *Young v. Greater Portland Transit Dist.*, 535 A.2d 417, 418-19 (Me. 1987) (finding that language in a municipal transit district's charter permitting it to "sue or be sued" was not an explicit waiver of governmental immunity divesting the district of the protections of the Maine Tort Claims Act)).

Here, Mr. Dean's claim for negligent discharge of pollutants does not fit within the exception to sovereign immunity in section 8104-A(3) because water is not a pollutant or toxic liquid. The plain language of section 8104-A(3) makes clear that the word "toxic" modifies not only chemicals, but also liquids and gases. *See Espander v. City of Albuquerque*, 849 P.2d 384, 387 (N.M. Ct. App. 1993), *overruled on other grounds* by 896 P.2d 1164 (N.M. 1995) (finding that the city was immune from liability for flooding because "the most reasonable construction" of the analogous New Mexico Tort Claims Act provision is that "liquids is modified by the word toxic"). This interpretation is supported by the fact that the statute's catchall provision refers to other "irritants, contaminants, or pollutants." 14 M.R.S.A. § 8104-A(3). In addition, the statute's title, "discharge of pollutants," makes clear that the statute is not intended to apply to the discharge of liquids that are not in themselves pollutants. Accordingly, Count III of Mr.

29

Dean's Cross-Claim against DHHS for negligent discharge of pollutants does not fit within 14 M.R.S.A. § 8104-A(3)'s exception to sovereign immunity and is thereby barred.

2) *Whether Article V of the Maine Probate Code Waives Sovereign Immunity for Claims Brought Thereunder.*

This section addresses Plaintiffs' contention that the Maine Probate Code operates as a waiver of sovereign immunity when DHHS elects to act as a public conservator, at least to the extent of the conservator's bond that DHHS, like any other fiduciary acting as guardian, conservator or trustee, is mandated by the Probate Code to obtain. DHHS contends that the Plaintiffs' claims against it for breach of fiduciary duty are tort claims and thus are barred by the Maine Tort Claims Act.

The starting point for the analysis is the premise, codified in the Maine Tort Claims Act, that sovereign immunity prevails unless waived: "Except as otherwise expressly provided by statute, all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages." 14 M.R.S.A. § 8103. The vast majority of cases under the Maine Tort Claims Act address waivers of sovereign immunity pursuant to 14 M.R.S.A. § 8104-A. However, the Maine Tort Claims Act also recognizes that if a governmental entity purchases insurance that "provides coverage in areas where the governmental entity is immune, the governmental entity shall be liable in those substantive areas but only to the limits of the insurance coverage." 14 M.R.S.A. § 8116.

Furthermore, the Law Court recognizes that the Legislature may waive sovereign immunity through other statutes and statutory schemes. *See e.g. Clockedile v. State Dep't of Transp.*, 437 A.2d 187, 190-91 (Me. 1981). It is the Plaintiffs' contention that the public conservator provisions of the Maine Probate Code incorporate exactly such a waiver.

"The immunity of the sovereign from suit is one of the highest attributes inherent in the nature of sovereignty" and can only be waived by "specific authority conferred by an enactment

30

of the Legislature." *Knowlton*, 2009 ME 79, ¶ 12, 976 A.2d 973 (citation omitted). As noted above, "[w]aivers are not generally implied and even explicit waivers are construed narrowly." *Id.* (citation omitted). For example, *Hinckley v. Penobscot Valley Hosp.* determined that even though the Maine Health Security Act ("MHSA") was intended to occupy the field of medical malpractice claims brought against health care providers and practitioners, the provision that "any action for damages for injury or death against any health care provider" did not constitute a waiver of sovereign immunity for hospitals owned and operated by a governmental entity facing malpractice claims. 2002 ME 70, ¶¶ 8-10, 794 A.2d 643.

*Hinckley* explained that "[n]otwithstanding the obvious breadth of the MHSA, it does not explicitly reference the Maine Tort Claims Act, nor does it specifically waive state immunity as to medical malpractice actions." *Id.* ¶ 10. *Hinckley* further rejected the argument that the plaintiff could bring a medical malpractice claim in accordance with the terms of the MHSA because: 1) "the MHSA is a procedural Act. It does not provide for or create the medical malpractice cause of action, but governs how such actions are to be brought" and 2) the Law Court has "never held that an individual could bring suit against a governmental entity under a statute that provides for a specific cause of action without first determining that the statute expressly waived governmental immunity." *Id.* ¶¶ 11-12.

However, "[t]he rule that waivers of immunity must be explicit is not without exception." *Knowlton*, 2009 ME 79, ¶ 13, 976 A.2d 973. For example, Maine has recognized that "a general statute allowing the State to enter into contracts implies a waiver of sovereign immunity by the Legislature when the State is sued for breach of that contract." *Id.* (quoting *Profit Recovery Group, USA, Inc. v. Comm'r, Dep't of Admin. & Fin. Serv.*, 2005 ME 58, ¶ 28, 871 A.2d 1237). *Knowlton* explored the parameters of this exception while determining whether 10 M.R.S.A. § 8003(5)(B) gave rise to an implicit waiver of the State's sovereign immunity from

31

claims for breach of contract. 2009 ME 79, ¶ 18, 976 A.2d 973. In *Knowlton*, the plaintiff entered into a consent agreement with the State to resolve licensing violations alleged by the Bureau of Insurance. *Id.* ¶¶ 3-4. The consent agreement imposed certain penalties against the plaintiff, but also provided that no further disciplinary measures would be taken against him. *Id.* Subsequently, the plaintiff's employer entered into a separate consent agreement with the State in which the employer agreed to terminate the plaintiff from his position as a branch manager. *Id.* ¶ 5. After the plaintiff was terminated, he brought suit against the State for its breach of the consent agreement arguing that the State had implicitly waived its immunity pursuant to 10 M.R.S.A. § 8003(5)(b). *Id.* ¶ 1.

In rejecting the plaintiff's argument, *Knowlton* determined that "[t]he plain language of section 8003(5)(B) does not expressly waive sovereign immunity." *Id.* at ¶ 14. Even though the statute provided that a consent agreement entered into by the Superintendent of Insurance could be enforced in the Superior Court, this provision was "an extension of the Superintendent's general duty to enforce the Insurance-Code." *Id.*[9] Section 8003(5)(B) did "not expressly confer to individuals who enter into a consent agreement…a right to sue for damages based on an alleged breach of the agreement." *Id.* Furthermore, *Knowlton* explained that the "judicial enforcement of a consent agreement is a remedy that is distinct from compensatory damages awarded for the breach of that agreement." *Id.*

---

[9] The full text of 10 M.R.S.A. § 8003(5)(B) provides:
> The bureau, office, board or commission <u>may execute a consent agreement that resolves a complaint or investigation without further proceedings</u>. Consent agreements may be entered into only with the consent of: the applicant, licensee or registrant; the bureau, office, board or commission; and the Department of the Attorney General. Any remedy, penalty or fine that is otherwise available by law, even if only in the jurisdiction of the Superior Court, may be achieved by consent agreement, including long-term suspension and permanent revocation of a professional or occupational license or registration. A consent agreement is not subject to review or appeal, and may be modified only by a writing executed by all parties to the original consent agreement. <u>A consent agreement is enforceable by an action in Superior Court</u>.

(emphasis added).

*Knowlton* then addressed whether section 8003(5)(B) constituted a general statute that permitted the state to enter into contracts and resulted in the abrogation of sovereign immunity. *Id.* ¶¶ 16-18. In finding it did not, *Knowlton* drew a distinction between statutes that authorize the State to enter into contracts in its proprietary role involving the establishment of financial obligations, and statutes that authorize the State to resolve regulation enforcement proceedings by consent agreement in the exercise of its police powers. *Id.* ¶ 17.

The former is illustrated by 24-A M.R.S.A. § 208, which authorizes the Superintendent of Insurance to contract for actuarial services as needed to discharge its duties and abrogates sovereign immunity, while the latter is illustrated by section 8003(5)(B), which permits the Superintendent to enter into a consent agreement that resolves a complaint or investigation as part of its authority to regulate the insurance industry. *Id.* "Because a consent agreement made pursuant to section 8003(5)(B) is in furtherance of the Superintendent's duty to protect the public interest through enforcement of the Insurance Code, it does not give rise to an implicit waiver of the State's sovereign immunity from claims for breach of contract." *Id.* ¶ 18.

In this case, the pertinent statutory scheme is Article V of the Maine Probate Code governing the protection of persons under disability and their property. Article V provides that DHHS may be appointed as a public conservator or guardian for incapacitated persons who are in need of protective services. 18-A M.R.S.A. § 5-601(a), (b). "[T]he appointment, termination, rights and duties, and other provisions for guardians and conservators in this Article shall apply to public guardians and conservators. 18-A M.R.S.A. § 5-601(c); *see also* 18-A M.R.S.A. § 5-607 ("A public guardian or conservator has the same powers, rights and duties respecting his ward or the protected person as provided for guardians and conservators by the

33

other parts of this Article" except as otherwise specified in subsections inapplicable to the present dispute).

The duties of a public conservator include acting as a fiduciary for the conservatee and observing the standards of care applicable to trustees. 18-A M.R.S.A. § 5-408-A. A conservator "is individually liable for obligations arising from ownership or control of property of the estate or for torts committed in the course of administration of the estate only if he is personally at fault." 18-A M.R.S.A. § 5-429(b).

Article V of the Probate Code also requires a public conservator or guardian to "give a surety bond for the joint benefit of the wards or protected persons placed under the responsibility of the public guardian or conservator and the State of Maine, with a surety company...in an amount not less than the total value of all assets held by the public guardian or conservator, which amount shall be computed at the end of each state fiscal year and approved by the judge of the probate court for Kennebec County. 18-A M.R.S.A. § 5-611.

Although Article V of the Maine Probate Code does not make an explicit statement that sovereign immunity is waived for governmental actions that violate the Code, the State Defendants acknowledge that only DHHS can act as a public conservator. It is therefore highly significant that the Legislature could only have had DHHS in mind in providing that the "rights and duties, and other provisions for guardians and conservators in this Article shall apply to public guardians and conservators." 18-A M.R.S.A. § 5-601(c). Likewise, the Legislature must have had DHHS in mind in enacting the express requirement that a public conservator obtain a bond "for the joint benefit of the wards or protected persons placed under the responsibility of the public guardian or conservator...." 18-A M.R.S.A. § 5-611.

Obviously, the bond would be utterly meaningless—not to mention a complete waste of taxpayer funds—if the persons for whose particular benefit the Probate Code expressly requires

34

DHHS to secure the bond are allowed no recourse against the bond when DHHS is in breach of the fiduciary duty that the Code also expressly imposes. Yet, that is essentially DHHS's argument in this case.

Based on the express language of the Maine Probate Code imposing the same duties on DHHS—the only possible public conservator—as are imposed on trustees and other fiduciaries, coupled with the express requirement that DHHS obtain a surety bond for the benefit of those for whom it acts as conservator: the court concludes that, while claims for breach of fiduciary duty constitute tort claims,[10] the Maine Probate Code constitutes an express waiver of DHHS's sovereign immunity to the extent DHHS is liable for breach of fiduciary duty as a public conservator. *See The Woodward School for Girls, Inc. v. City of Quincy*, 469 Mass. 151, 176-177 (2014) (finding an implicit waiver in Massachusetts's Prudent Investor Act for breach of fiduciary duties by a governmental entity that agrees to serve as a trustee because a "trustee, regardless of whether it is a municipality, a corporation, or a private individual, is accountable to courts for its conduct in fulfilling, or committing a breach of, the fiduciary duties it owes" and because a "'natural and ordinary reading' of the Prudent Investor Act indicates that where a municipality accepts the obligations of serving as a trustee, it will be held to the same standards and subject to the same penalties as any other trustee").

It may well be that the waiver is limited to the surety bond that the Maine Probate Code requires a public conservator—which can only be DHHS—to obtain "for the joint benefit of the wards or protected persons placed under the responsibility of the public guardian or conservator...." 18-A M.R.S.A. § 5-611.

---

[10] *See e.g. WahlcoMetroflex, Inc. v. Baldwin*, 2010 ME 26, ¶ 23, 991 A.2d 44 (referring to a "tort claim for breach of fiduciary duty"); *Guitard v. Gorham Sav. Bank*, 2002 Me. Super. LEXIS 82, *5-6 (Apr. 9, 2002) (same); RESTATEMENT (SECOND) OF TORTS § 874 Cmt. b (1979) (same).

Plaintiffs analogize the bond to liability insurance in noting that, even under the Maine Tort Claims Act, sovereign immunity is waived to the extent of liability insurance. *See* 14 M.R.S.A. § 8116 ("If the insurance provides coverage in areas where the governmental entity is immune, the governmental entity shall be liable in those substantive areas but only to the limits of the insurance coverage.") While the State Defendants contend that the surety bond that DHHS, as public conservator, is required to provide is not liability insurance, the surety bond has not been made part of the record for the court's review.[11]

Furthermore, the Maine Probate Law Revision Commission's Study and Recommendations concerning Maine Probate Law indicate the surety bond was intended to serve as a form of insurance. Maine Probate Law Review Commission, "Report of the Commission's Study and Recommendations Concerning Maine Probate Law" (Oct. 1978). Specifically, the Study: 1) notes the close resemblance between surety bonds and "fiduciary insurance" and "surety insurance;" 2) describes probate bonds as "a fail-safe insurance mechanism, a device for making up promptly losses sustained...as a result of fiduciary breach when breach comes to light;" 3) discusses the wisdom of requiring probate bonds, while noting that American law does not typically require private citizens to carry insurance; and 4) generally discusses probate bonds as a form of insurance. *Id.* at 211-12, 213, 231-32, 235-36.

Accordingly, the court will deny the State Defendants' Motion for summary judgment, as to William Dean's claims for breach of fiduciary duty that are brought against DHHS itself, in its capacity as public conservator for Mr. Dean, pursuant to Article V of the Probate Code. Although breach of fiduciary duty claims are indeed tort claims, as the State asserts, the Maine

---

[11] The State obtains a single surety bond "in an amount not less than the total value of all assets held by the public guardian or conservator, which amount shall be computed at the end of each state fiscal year." 18-A M.R.S.A. § 5-611. Although the State Defendants' claim that the surety bond DHHS obtained did not include the value of Mr. Dean's assets because the conservatorship began on September 6, 2012, terminated on March 6, 2013, and the State's fiscal year ends each June 30, the court is not prepared to determine that the surety bond does not constitute liability insurance without seeing the bond DHHS obtained for the 2012-2013 fiscal year.

Probate Code effects a limited statutory waiver of immunity as to claims by a ward/conservatee against DHHS as public conservator, at least to the extent of the DHHS surety bond. Moreover, even assuming the notice requirements of the Maine Tort Claims Act apply to Mr. Dean's breach of fiduciary claims against DHHS under the Maine Probate Code, for the reasons noted below, Mr. Dean has, at least, created a genuine issue of material fact as to whether he, complied with those requirements.

Plaintiff Claire Perry, however, cannot avail herself of the limited waiver of sovereign immunity that this court concludes exists in the public conservator provisions of the Maine Probate Code, because DHHS's duty under the Maine Probate Code ran to Mr. Dean, not to her. The State Defendants argue that, even assuming Ms. Perry's claims for breach of fiduciary duty against DHHS are not barred by sovereign immunity, they must fail because DHHS did not owe Ms. Perry a fiduciary duty as the temporary conservator of Mr. Dean. Plaintiffs respond that DHHS owed her a fiduciary duty as the sole legal heir of Mr. Dean's estate.

Article V, Part 4 of the Maine Probate Code, under which DHHS was appointed temporary conservator, aims to protect the property of minors and individuals with disabilities. Pursuant to those statutes, DHHS has a fiduciary duty to observe the standards of care applicable to trustees. 18-A M.R.S.A. § 5-417. A trustee is bound to exercise its powers solely in the interests of the beneficiaries. 18-B M.R.S.A. § 802(1). Article V, Part 4 of the Maine Probate Code is clear that when appointing a conservator, the intended beneficiary is the conservatee. *See e.g.* 18-A M.R.S.A. § 5-401(2) (evincing a concern for the disabled individual's property and affairs); § 5-408-A (focusing on protecting the disabled individual in the event of an emergency). Recognizing fiduciary duties to individuals other than the conservatee could give rise to irreconcilable conflicts of interest. *See Lamie v. Wright,* 2014 U.S. Dist. LEXIS

37

93818, *16-17 (W.D. Mich. June 4, 2014); *see also Grahl v. Davis*, 971 S.W.3d 373, 377-378 (Tenn. 1998).

Moreover, as noted above, the DHHS bond is for the benefit of the ward to whom DHHS owes its fiduciary duty, not for the benefit of third parties. Assuming the waiver of sovereign immunity reflected in Article V of the Probate Code is limited to the extent of the DHHS bond, Ms. Perry lacks standing to claim under the bond.[12]

Accordingly, because DHHS's fiduciary duty was to Mr. Dean, not to Ms. Perry, summary judgment is granted against her claims against DHHS to the extent they are based on breach of the fiduciary duties imposed by the Maine Probate Code.

The analysis now turns to the Plaintiffs' tort claims outside the Maine Probate Code, against DHHS and the individual State Defendants.

B.      Whether Plaintiffs Complied with the Maine Tort Claims Act's Notice Requirement for Their Causes of Action Against DHHS and the Individual State Defendants

·Initially, it should be noted that the foregoing analysis of DHHS's sovereign immunity in light of the Maine Probate Code provisions regarding public conservators does not apply to the individual State Defendants, because none of them served as public conservator. The tort claims against them, as well as the tort claims against DHHS that are not rooted in the Maine Probate Code, must therefore be evaluated under the Maine Tort Claims Act. All of Plaintiffs'

---

[12] There are two further reasons why DHHS is entitled to summary judgment on Ms. Perry's claims. First, her claims against DHHS for breach of fiduciary duty and for tortious interference with contract or expectancy are, in fact, tort claims, and thus likely subject to the notice requirements of the Maine Tort Claims Act. As discussed below, she has not complied with that requirement. Second, she has not made a prima facie showing in support of either claim for purposes of avoiding summary judgment. Her breach of fiduciary duty claim fails because DHHS owed her no fiduciary duty. Her tortious interference claim fails because she has not made a prima facie showing of any intent on the part of DHHS or any other State Defendant. The tort of interference with contract or expectancy developed as an intentional tort, and there is no liability for negligent interference with a contract. *See* RESTATEMENT (SECOND) OF TORTS § 766C and cmt. a. Moreover, DHHS had a legal right to sell the Owls Head property, although whether it needed to is a different question.

claims sound in tort except for their causes of action brought pursuant to the Maine Civil Rights Act and 42 U.S.C. § 1983.

The State Defendants argue that Plaintiffs' tort claims against them are barred because they did not substantially comply with the notice requirements of the Maine Tort Claims Act. Under the Act, a plaintiff may not bring a tort claim against the State or its employees unless the plaintiff substantially complies with certain notice requirements. 14 M.R.S.A. § 8107(4). Those requirements include filing a notice of claim within 180 days after the cause of action accrues, unless the plaintiff can show good cause why notice could not have reasonably been filed within the 180-day limit. 14 M.R.S.A. § 8107(1). For purposes of the Act, "[a]n injured party's cause of action accrues when the party suffers a judicially cognizable injury." *McNicholas v. Bickford*, 612 A.2d 866, 869 (Me. 1992); *see also Porter v. Philbrick-Gates*, 2000 ME 35, ¶ 4 n.2, 745 A.2d 996. "That injury arises when a wrongful act produces an injury for which the plaintiff is entitled to seek judicial vindication." *McNicholas*, 612 A.2d at 869 (quotation omitted).

The notice of claim must contain certain information regarding the claim and, with respect to claims against the State and State employees, must be filed with the Attorney General and with the state agency allegedly responsible for the injury. 14 M.R.S.A. § 8107(1) & 3(A). No claim may be brought against the State or its employees pursuant to the Maine Tort Claims Act unless the plaintiff has "substantially complied" with this notice requirement. 14 M.R.S.A. § 8107(4); *see also Peters v. City of Westbrook*, 2001 ME 179, ¶ 5, 787 A.2d 141 ("Plaintiffs who seek to hold a governmental unit and employee liable must first meet a procedural requirement of notifying the unit of the intention to bring a claim"). "Failure to comply [with the notice provision] bars the suit." *Porter v. Philbrick-Gates*, 2000 ME 35, ¶ 4, 745 A.2d 996.

39

1. *Whether Ms. Perry Substantially Complied with the Maine Tort Claims Act's Notice Requirements*

Initially, it must be noted that Ms. Perry's claim for interference with contract or expectancy, which is often called tortious interference with contract or expectancy, sounds in tort, not in contract. *See e.g. Morrill v. Morrill*, 1998 ME 133, ¶ 7, 712 A.2d 1039. Her state law tort claims—which do not include her Maine Civil Rights Act claim—are thus subject to the provisions of the Maine Tort Claims Act.

The State Defendants argue that Ms. Perry's tort claims against them accrued on November 6, 2012, when DHHS locked her out of the Owls Head cottage without sufficient time to remove her personal property. As a result, Ms. Perry's notice of claim under the Maine Tort Claims Act was due by May 5, 2013. The State Defendants argue that Ms. Perry did not file a notice of claim by that date and, in fact, never filed a notice of claim before initiating the present lawsuit.

Plaintiffs respond that beginning in November 2012, the State Defendants have had actual notice that Ms. Perry would bring tort claims against them. They also argue that Ms. Perry's cause of action for interference with contract or expectancy is based on a continuing harm and is thus subject to a constantly replenishing 180 day limit. In addition, they claim that Ms. Perry complied with the notice provisions of the Maine Tort Claims Act through: 1) a November 30, 2012 letter to AAG Greason; 2) a January 10, 2013 petition for emergency hearing and order relating to the proposed sale of Mr. Dean's Owls Head cottage; 3) a January 14, 2013 notice of pending litigation recorded in the Knox County Registry of Deeds; and 4) Ms. Perry's May 10, 2013 affidavit filed in connection with her Complaint and related ex parte motion for attachment and trustee process.

The State Defendants reply that actual notice of the Plaintiffs' claims combined with a lack of prejudice does not equate to substantial compliance with the Maine Tort Claims Act's

notice requirements. *Pepperman v. Barrett*, 661 A.2d 1124, 1127 (Me. 1995) (prejudice); *Kelly v. University of Maine*, 623 A.2d 169 (Me. 1993) (actual notice). They further argue that the documents Ms. Perry relies on did not substantially comply with the Act's notice requirements because they were not sent to the appropriate state agency and Attorney General, and three out of four of the documents do not suggest that Ms. Perry is asserting a claim against any State Defendant. Furthermore, they argue that Ms. Perry's affidavit does not describe what claims she is asserting, what state employees were involved, or what damages she suffered.

Ms. Perry's tort claims against the State Defendants appears to be premised on three incidents: 1) Ms. Archer's allegedly false representations to the Probate Court on September 5th and 6th of 2012; 2) the eviction of Ms. Perry from the Owls Head cottage by DHHS and Mr. Vaughan on November 6, 2012; and 3) allegedly false representations by Ms. Archer to the Probate Court on January 25, 2013. The determination of the exact date on which these claims accrued, however, is not essential to the court's analysis, because it is clear that Ms. Perry has never provided notice of her claims in a manner that substantially complied with the Maine Tort Claims Act.

First, Mr. Jenny's November 30, 2012 letter to AAG Greason did not substantially comply with the Maine Tort Claims Act's notice provisions because it did not set out the basis for Ms. Perry's claims. The letter explained Ms. Perry's basis for residing in the Owls Head cottage and her claim to personal property located therein, but did not discuss the nature of the alleged injury she suffered or the amount of monetary damages she claimed. (Jenny Aff. Ex. B.) In addition, the letter was not sent to Ms. Archer, the State, DHHS, or the Attorney General. (*Id.*; 14 M.R.S.A. § 8107(3).) Instead, it was sent solely to AAG Greason. (Jenny Aff. Ex. B.)

Second, the January 10, 2013 Petition for Emergency Hearing and Order did not substantially comply with the Maine Tort Claims Act's notice requirements because it did not

41

provide notice of Ms. Perry's suit. (Cardone Aff. Ex. A.) Specifically, the Petition does not contain a statement of the monetary damages claimed or the basis for Ms. Perry's tort claims. (*Id.*) In addition, the January 14, 2013 Notice of Pending Litigation was not sent to the State Defendants or the Attorney General, does not provide notice that Ms. Perry is bringing claims against any of the individual State Defendants, and does not state the amount of monetary damages claimed. (Ex. 54 to Pl.s' A.S.M.F.) Instead, it asserts that Ms. Perry is challenging DHHS's attempts to sell the Rockland Property because the price sought is below fair market value. (*Id.*)

Third, Ms. Perry's May 10, 2013 affidavit did not substantially comply with the Maine Tort Claims Act's notice provisions because it was filed at the same time as Ms. Perry's Complaint. Accepting this affidavit as substantially complying with the Act's notice provisions would undermine the purpose of the notice requirement, which is "to enable the governmental entity to investigate and evaluate claims for the purposes of defense or settlement" and to "allow governmental entities to avoid needless expense and litigation by providing an opportunity for amicable resolution of disputes *prior to* formal litigation. *Pepperman v. Barrett,* 661 A.2d 1124, 1126 (Me. 1995) (emphasis added).

Even if Ms. Perry's May 10, 2013 affidavit were filed before she instituted suit, the affidavit, standing by itself, fails to substantially comply with the Maine Tort Claims Act's notice provisions. This is because the affidavit does not identify the governmental employees involved or their addresses. (Ex. A. to Perry Supplemental Aff.) The affidavit also fails to provide a statement of the amount of monetary damages claimed, providing, at most, notice that Ms. Perry seeks some monetary damages based on the sale of the Owls Head cottage for less than the tax assessed value. (*Id.* ¶ 24.) Accordingly, summary judgment is granted against Ms. Perry's tort claims against the State Defendants. Specifically, summary judgment

is granted against Counts VIII and X of Ms. Perry's First Amended Complaint for abuse of process against Ms. Archer and Mr. Vaughan, respectively.[13]

> 2. *Whether Mr. Dean Substantially Complied with the Maine Tort Claims Act's Notice Requirements*

Mr. Dean filed a notice of tort claim on September 17, 2013. (Sproul Aff., ¶¶ 3-4 and Exhibit A thereto.) The State Defendants do not contend that the substance of the notice was insufficient. Instead, they argue that the notice was untimely. Specifically, they argue that Mr. Dean's claims accrued on multiple dates, with the latest accruing on January 10, 2013, requiring notice by July 9, 2013. Because Mr. Dean did not provide notice of claim until September 17, 2013, they argue that his claims are untimely.

Plaintiffs respond that Mr. Dean had good cause for not filing the notice until September 17, 2013. Specifically, they argue a competent conservator and guardian for Mr. Dean was not appointed until August 1, 2013, and he cannot be deemed to be on notice of the extent of the State Defendants' alleged wrongdoing until then. Based on the August 1, 2013 date, Plaintiffs argue that Mr. Dean's notice was timely.

The State Defendants reply that Mr. Dean was appointed independent counsel on February 15, 2013 and that DHHS's temporary conservatorship expired on March 6, 2013. Therefore, at the latest, the tolling of the 180-day notice provision should end on March 6, 2013. In that case, Mr. Dean's deadline for filing a notice of claim was September 2, 2013.

"In order to invoke the exception of good cause, the plaintiff must establish that in some meaningful way the plaintiff was prevented from learning of the information forming the basis of the plaintiff's complaint, or that it is specifically factually shown that both the plaintiff and

---

[13] As discussed *supra* section II(A)(2), the court already granted summary judgment against Ms. Perry's claims against DHHS for breach of fiduciary duty and interference with contract or expectancy based in part on her failure to comply with the Maine Tort Claims Act's notice provisions.

those adults who could file a claim on the plaintiff's behalf were unable to file a timely notice of the claim. *McNicholas*, 612 A.2d at 869-870 (citations omitted).

Here, there is at least a genuine issue of material fact as to whether Mr. Dean had good cause for not filing notice until September 17, 2013. *See Beaucage v. City of Rockland*, 2000 ME 184, ¶ 7, 760 A.2d 1054. This is because it is undisputed that Mr. Dean remained incapacitated and in need of a conservator after the expiration of DHHS's temporary conservatorship and at least until Ms. Vose was appointed conservator on August 1, 2013. (Pls' A.S.M.F. ¶ 220.) Furthermore, while Mr. Belisle was appointed as an attorney for Mr. Dean, there is at least a genuine issue of material fact as to whether Mr. Belisle was generally appointed to represent Mr. Dean or more specifically appointed to represent him in connection with the petitions for appointment of conservator and guardian pending as of February 15, 2013. (Ex. D to Cardone Aff.) Accordingly, summary judgment is not warranted against Mr. Dean for failing to substantially comply with the notice provisions of the Maine Tort Claims Act on the record presented.

The analysis thus proceeds, as to Mr. Dean's claims only, to the substantive immunity defenses of the individual State Defendants.

C.    Whether Mr. Dean's Tort Claims Against Ms. Archer and Mr. Vaughan are Barred by Discretionary Function Immunity

The State Defendants argue that DHHS, Ms. Vaughan, and Ms. Archer are entitled to discretionary function immunity from Mr. Dean's tort claims, and also Ms. Perry's claims.[14] The Plaintiffs respond that Ms. Archer is not entitled to discretionary function immunity because her appearance in Probate Court to request the appointment of a temporary public

---

[14] As discussed *supra* section II(B)(1), summary judgment is granted against Ms. Perry's tort claims against Ms. Archer and Ms. Vaughan for failure to comply with the Maine Tort Claims Act's notice provisions. Accordingly, this section only addresses Mr. Dean's tort claims against Ms. Archer and Mr. Vaughan.

conservator, testimony about the management of Mr. Dean's real estate, and testimony about the fate of his cat were not reasonably encompassed by her duties as a social worker. Plaintiffs further respond that Mr. Vaughan is not entitled to immunity because he knowingly made false statements and acted in bad faith.

The Maine Tort Claims Act immunizes the State and its employees against all claims resulting from "[p]erforming or failing to perform a discretionary function or duty, whether or not the discretion is abused." 14 M.R.S.A. § 8104-B(3); 14 M.R.S.A. § 8111(1)(C). The absolute immunity provided for discretionary functions "shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized by statute...." 14 M.R.S.A. § 8111.

As such, a "government employee is entitled to absolute immunity when he or she performs a discretionary act." *Lewis v. Keegan*, 2006 ME 93, ¶ 14, 903 A.2d 342. "If the action of the government employee is found to exceed the scope of his or her discretion, that immunity may not apply. *Id.* (citing *Richards v. Town of Eliot*, 2001 ME 132, ¶ 32, 780 A.2d 281). "If the government employee is found to have acted within the scope of his or her discretion, the absolute immunity provided by the Maine Tort Claims Act will apply 'whether or not the discretion is abused.'" *Id.* (quoting 14 M.R.S.A. § 8111(1)(C)). Furthermore, discretionary function immunity protects governmental employees "from intentional tort claims as long as their conduct is not so egregious that 'it exceeds as a matter of law, the scope of any discretion [they] could have possessed in [their] official capacity.'" *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1055 (Me. 1992) (quoting *Polley v. Atwell*, 581 A.2d 410, 414 (Me. 1990)).

Where the duties of the government employee in question are not clear, the court uses a four-factor test to determine whether discretionary function immunity applies:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Darling v. Augusta Mental Health Institute,* 535 A.2d 421, 426 (Me. 1987) (quotation omitted); *Gove v. Carter,* 2001 ME 126, ¶¶ 13-14, 775 A.2d 368; *see also Roberts v. Maine,* 1999 ME 89, ¶ 8, 731 A.2d 855. "The first, second, and fourth factors help determine whether the governmental employee was performing or failing to perform an official 'function or duty.'" *Carroll v. City of Portland,* 1999 ME 131, ¶ 7, 736 A.2d 279. "The third factor helps determine whether that function or duty was 'discretionary' in nature, as opposed to merely 'ministerial[.]'" *Id.* This factor is met when the task at issue "involves the exercise of the individual employee's professional judgment[.]" *Brooks v. Augusta Mental Health Institute,* 606 A.2d 789, 791 (Me. 1992).

The Restatement (Second) of Torts describes the purpose of discretionary function immunity as follows:

> The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognition of the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits . . . . Tort liability should not be imposed for conduct of a type for which the imposition of liability would substantially impair the effective performance of a discretionary function.

*Darling v. Augusta Mental Health Institute,* 535 A.2d at 425 (quoting RESTATEMENT (SECOND) OF TORTS § 895D cmt. b.

46

1.  *Whether Ms. Archer is Entitled to Discretionary Function Immunity Against Mr. Dean's Claim for Intentional Misrepresentation*

Plaintiffs assert that Ms. Archer's actions were neither discretionary nor reasonably encompassed within the duties of a social worker. In particular, Plaintiffs point towards the following alleged actions by Ms. Archer: 1) lying about providing Ms. Perry notice of the September 6, 2012 hearing; 2) lying about the circumstances giving rise to the so-called "emergency" at issue in the hearing; 3) lying about her intention to sell the Owls Head cottage for fair market value; 4) stating that there was no suitable private party available to serve as Mr. Dean's conservator; 5) lying about an appraisal being done on Mr. Dean's Rockland house that justified attempting to sell it for $65,000; and 6) intentionally misrepresenting facts to the Rockland Animal Hospital to induce it to euthanize Caterpillar.

Plaintiffs further contend that Ms. Archer had no training or experience with the law, finance, tax liens, or real estate transactions and had no business preparing a petition for the appointment of an emergency conservatorship or testifying before the Probate Court. Finally, Plaintiffs argue that Ms. Archer's actions were outside the bounds of any possible discretionary function encompassed by the job of a social worker as the law is clear that DHHS may designate employees to represent the department in Probate Court for requests for emergency guardianships, *not* conservatorships. *See* 22 M.R.S.A. § 3473(3).

22 M.R.S.A. § 3473 provides that the Commissioner of DHHS "may designate employees of the department to represent the department in Probate Court in…[r]equests for emergency guardianships arising from the need for…orders necessary to apply for or preserve an estate in emergency situations." 22 M.R.S.A. § 3473(3)(B). While subsection B expressly refers to "emergency guardianships," it is clear that the legislative intent behind the statute extends to emergency conservatorships. This is because the statute authorizes employees to represent DHHS in Probate Court to apply "for orders necessary to apply for or preserve an

estate in emergency situations." *Id.; see also Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 23, 107 A.2d 621 ("In short, in interpreting the plain language of the statute, we must take pains to avoid an overly simplistic or overly broad interpretation of [the statute] that wreaks havoc on, rather than preserves, the Legislature's intent"). Accordingly, Ms. Archer's September 6, 2012 appearance in the Probate Court was reasonably encompassed by her duties as an employee of DHHS.[15]

As to Ms. Archer's other challenged actions, the court notes that Mr. Dean's claim for intentional misrepresentation against Ms. Archer is only premised on her alleged misrepresentations about the lack of a suitable private party to serve as Mr. Dean's conservator and her alleged misrepresentations to the Rockland Animal Hospital. Both of these actions clearly constitute the performance of a discretionary function.

Regarding Ms. Archer's alleged misrepresentation to the Probate Court, the statement was made while Ms. Archer was attempting to have an emergency guardian and conservator appointed to represent Mr. Dean so that he would not lose his two properties to foreclosure. (*See generally* Ex.s B & F to Archer Aff.) This action was in furtherance of Article V of the Probate Code's program for protecting disabled individuals and was essential for appointing DHHS as conservator. *See* 18-A M.R.S.A. §§ 5-401-5-432, 5-601-614. Furthermore, as discussed in the preceding paragraph, Ms. Archer had the authority and duty to appear before the Probate Court and testify as to whether a suitable private conservator was available. Ms. Archer's statement involved the exercise of judgment as to the availability of a suitable private conservator and the wisdom of appointing a public conservator. Finally, Mr. Dean has failed to present any evidence relevant to the detrimental reliance element of an intentional misrepresentation claim.

---

[15] It also bears noting that Ms. Archer filed a petition for emergency appointment of DHHS as guardian *and* conservator for Mr. Dean. (Ex. B to Archer Aff.)

Similarly, Ms. Archer's alleged misrepresentations about Caterpillar were carried out while attempting to manage Mr. Dean's estate as authorized by the September 6, 2012 Order.

While the wisdom of Ms. Archer's actions may be debatable, it is clear that they involved the exercise of professional judgment and discretion. *Brooks v. Augusta Mental Health Institute*, 606 A.2d 789, 791 (Me. 1992). Furthermore, Mr. Dean has not shown how any of the alleged misrepresentations, in and of themselves, caused him to act in reliance on them or caused the injury and loss of which he complains.

Accordingly, summary judgment is granted against Mr. Dean's claim for intentional misrepresentation against Ms. Archer because she is protected by discretionary function immunity.

2. *Whether Mr. Vaughan is Entitled to Discretionary Function Immunity Against Mr. Dean's Claim for Conversion*

Plaintiffs argue that Mr. Vaughan is not entitled to discretionary function immunity because he was acting in bad faith and for a constitutionally impermissible purpose when he acquired possession of Mr. Dean's property and sold it, or allowed Mr. Thistle to sell it, without any records, inventory or "semblance of a legitimate business transaction." Specifically, Plaintiffs argue that Mr. Vaughan was only authorized to address the so-called "emergency" arising out of the potential foreclosure of Mr. Dean's properties. Plaintiffs assert that Mr. Vaughan was not authorized to liquidate Mr. Dean's estate for his own pecuniary benefit.

While Plaintiffs have alleged that Mr. Vaughan liquidated Mr. Dean's assets for his own pecuniary benefit, there is no evidence in the summary judgment record indicating either that this was Mr. Vaughan's purpose or that he actually obtained any pecuniary benefit from the alleged liquidation. Accordingly, Mr. Dean has failed to make any showing, much less the

49

required prima facie showing, that Mr. Vaughan was acting for his own pecuniary benefit. *See Dyer v. Dep't. of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821.

Given the unsupported basis for Mr. Dean's allegation that Mr. Vaughan acted for his own pecuniary interest, the only remaining question is whether Mr. Vaughan was performing a discretionary duty when authorizing and/or participating in the sale of Mr. Dean's personal property. Although the sale could have been handled more carefully, whether and how to sell Mr. Dean's personal property were clearly discretionary decisions, and discretionary function immunity applies even if the employee abused his or her discretion. 14 M.R.S.A. § 8104-B(3); 14 M.R.S.A. § 8111(1)(C). Mr. Vaughan's decision to sell Mr. Dean's personal property clearly involved the exercise of professional judgment. Accordingly, the court grants summary judgment against Mr. Dean's claim for conversion, because Mr. Vaughan is protected by discretionary function immunity.

D.     Whether Summary Judgment is Warranted Against Mr. Dean's Tort Claims Against Attorney Cardone

1.     *Intentional Misrepresentation Against Attorney Cardone*

Mr. Dean claims that Attorney Cardone is liable for making, and allowing Ms. Archer to make, intentional misrepresentations to the Probate Court at the January 25, 2013 hearing. The State Defendants argue that an attorney or party's statements made in court during a pending matter cannot form the basis for a claim of intentional misrepresentation. This is because the plaintiff cannot be said to have detrimentally relied on said statements. In addition, the State Defendants argue that Mr. Dean cannot establish that the Probate Court relied on any particular statements made by Attorney Cardone or Ms. Archer. Finally, the State Defendants argue that allegations made in pleadings, witness testimony, and statements by attorneys during and relevant to judicial proceedings are absolutely privileged and cannot form the basis for civil claims. Plaintiffs respond that because Mr. Dean was incapacitated at the

50

January 25, 2013 hearing and did not have legal counsel, the Probate Court was "in essence" Mr. Dean.

In order to establish a claim for intentional misrepresentation, the Plaintiffs "must demonstrate specific facts that create a dispute as to whether defendants made a misrepresentation of material fact, with knowledge of its falsity or in reckless disregard of whether it was true or false and as to whether they reasonably relied on the misrepresentations to their detriment." *Barnes v. Zappia*, 658 A.2d 1086, 1089 (Me. 1995); *see also Francis v. Stinson*, 2000 ME 173, ¶ 38, 760 A.2d 209 (listing elements of claim for fraud or deceit). "Plaintiffs must produce evidence that demonstrates that the existence of each element of fraud is 'highly probable' rather than merely likely." *Barnes*, 658 A.2d at 1089.

In addition, an attorney's statements in the context of a pleading or judicial proceeding are absolutely privileged, provided that they are relevant to those proceedings. *Hamilton v. Greenleaf*, 677 A.2d 525, 527-528 (Me. 1996) (citing *Dineen* v. *Daughan*, 381 A.2d 663, 664-65, (Me. 1978)). "To avail oneself of the privilege, however, the attorney seeking the protection of the privilege must have become involved in the representation in good faith." *Id.*

Here, it is undisputed that Attorney Cardone's alleged misrepresentations were made during the course of judicial proceedings. In addition, there is no evidence indicating that Attorney Cardone acted in bad faith. Accordingly, Attorney Cardone's alleged misrepresentations are privileged and cannot serve as the basis for a claim of intentional misrepresentation. In addition, summary judgment is further warranted because Mr. Dean cannot demonstrate that he justifiably relied on Attorney Cardone's alleged misrepresentations. Accordingly, the court grants summary judgment against Mr. Dean's claim for intentional misrepresentation against Attorney Cardone.

51

2.    *Breach of Fiduciary Duty Against Attorney Cardone*

Mr. Dean asserts that Attorney Cardone breached her fiduciary duty by allowing the Owls Head cottage to be sold for less than fair market value without Probate Court approval pursuant to 18-A M.R.S.A. § 5-408(6) and for attempting to prevent and delay the discovery of water and mold damage to the Rockland house.

The State Defendants argue that summary judgment is warranted because Attorney Cardone did not owe Mr. Dean a fiduciary duty. They argue that Attorney Cardone was hired to represent DHHS and, it was only to DHHS, that Attorney Cardone owed a duty. Furthermore, the State Defendants argue that even if Attorney Cardone owed Mr. Dean a fiduciary duty, she did not violate it because the only information she possessed was that Mr. Dean was not opposed to the sale of the Owls Head cottage, that the cottage was being sold for only $11,000 less than an adjusted appraisal, and that the cottage would be foreclosed on if not sold by February 12, 2013. Plaintiffs respond that under the "multifactor third-party beneficiary test," Attorney Cardone owed Mr. Dean a duty of care.

Here, even assuming that Attorney Cardone owed Mr. Dean a fiduciary duty of care, summary judgment is still warranted against Mr. Dean's claim. This is because Attorney Cardone was under no duty to prevent the sales of the Owls Head cottage. As explained in greater detail in the court's companion order addressing Mr. Taylor's motion for summary judgment against Mr. Dean, 18-A M.R.S.A. § 5-408(6) is designed to provide the Probate Court with discretion about whether to require court approval before completing the sale of a protected person's property for less than fair market. The facts are undisputed that in this case, the Probate Court did not make any such finding or impose a requirement for court approval. Accordingly, Attorney Cardone was under no duty to obtain said approval before proceeding with the sale of the Owls Head cottage.

In addition, although Mr. Dean alleges that Attorney Cardone was aware of the burst water pipe at the Rockland house and attempted to delay and/or prevent its discovery, he has proffered no support for his claim. To the contrary, the only evidence presented indicates that Attorney Cardone was *not* aware of the circumstances that caused the water pipe to burst, including who, if anyone, was responsible. (Cardone Aff. ¶¶ 27-28.) Indeed, the evidence demonstrates that it was Ms. Archer, not Attorney Cardone, who implied that the burst water pipe at the Rockland house was caused by Mr. Dean, not DHHS. (Ex. 55 to Pl.s' A.S.M.F., p. 10.) Accordingly, the court grants summary judgment against Mr. Dean's claim for breach of fiduciary duty because the only evidence supporting Mr. Dean's claim are conclusory allegations, improbable inferences, and unsupported speculation. *Dyer. v. Dep't. of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821.

3. *Abuse of Process Against Attorney Cardone*

Mr. Dean alleges that Attorney Cardone abused a court process by filing a motion to clarify the Probate Court's January 25, 2013 Order. He claims that the filing of the motion was designed to promote the sale of the Rockland house before the expiration of the temporary conservatorship so that DHHS's negligence in maintaining the Property would not be discovered.

The State Defendants argue that Attorney Cardone's allegedly false statements to the Probate Court cannot serve as the basis for a cause of action because they are entitled to the judicial proceedings immunity. Even if the claims weren't barred, the State Defendants argue, there is nothing to suggest that Attorney Cardone misused any process. To the contrary, she filed a motion to clarify a previous order. In addition, the State Defendants claim that Plaintiffs have not pointed to any facts demonstrating an ulterior motive by Attorney Cardone, or that Attorney Cardone filed the motion to clarify to prevent Mr. Dean or others from learning of

the burst water pipe at the Rockland house. Finally, the State Defendants argue that because DDHS did not sell the Rockland house, the motion to clarify did not result in any delay of Mr. Dean's ability to discover the burst water pipe.

Plaintiffs respond that Mr. Dean's abuse of process claim must survive because there is ample evidence that Attorney Cardone lied at the January 25, 2013 hearing in order to prevent the discovery of the damage caused by the burst water pipe to the Rockland home.

In order to state a cause of action for abuse of process, the plaintiff must demonstrate that the defendant: 1) initiated or used a court document or process, in a manner not proper in the regular conduct of proceedings; 2) with the existence of ulterior motive; 3) resulting in damages to the plaintiff. *Tanguay v. Asen*, 1998 ME 277, ¶ 5, 722 A.2d 49.

Here, summary judgment is granted against Mr. Dean's claim for abuse of process because there is no evidence that Attorney Cardone attempted to delay or prevent the discovery of the burst water pipe at the Rockland house at the January 25, 2013 hearing or through the filing of a motion to clarify. Indeed, far from attempting to delay or prevent the discovery of the burst water pipe, Ms. Archer testified at the hearing that water pipes *had* burst at the Rockland house. (Ex. 55 to Pl.s' A.S.M.F., p. 10.) Furthermore, as discussed *supra* section II(D)(2), there is no evidence that Attorney Cardone was aware of the burst water pipe at the Rockland house or attempted to delay and/or prevent its discovery.

E.    Whether Summary Judgment is Warranted On Plaintiffs' Maine Civil Rights Act Claims

Plaintiffs allege that DHHS, acting under color of law, intentionally interfered with Mr. Dean's exercise and enjoyment of his due process rights to liberty and property. They further allege that DHHS acted in bad faith and with reckless disregard for Mr. Dean's rights to due process and exhibited a wanton and reckless indifference to the need to educate, train, and supervise its employees. Similarly, Ms. Perry alleges that DHHS, whether or not acting under

color of law, interfered with her right to live at the Owls Head cottage, deprived her of personal property located therein, and deprived her of procedural and substantive due process by selling the Owls Head cottage for substantially less than fair market value. Ms. Perry further claims that DHHS has a custom and/or practice of performing its duty as public conservator with reckless indifference to the constitutional rights of its citizens.

The State Defendants argue that summary judgment is warranted against Plaintiffs' claims because the Maine Civil Rights Act ("MCRA") only creates private causes of actions against individuals, not the State or DHHS. They further argue that no MCRA violation occurred because there was no interference with Plaintiffs' rights by physical force or violence, damage or destruction of property, trespass on property, or threats thereof.

Plaintiffs respond that their MCRA claims are against Mary Mayhew in her fiduciary capacity as public conservator. Plaintiffs then argue that because a private conservator is a "person" under the MCRA and the public conservator takes on all the duties, rights, and liabilities of a public conservator, it must be treated as a "person" under the MCRA. Plaintiffs also contend that DHHS had no legal authority to falsely testify before the Probate Court, use that false testimony as a means to kick Ms. Perry out of the Owls Head cottage, trespass on Mr. Dean's properties, and damage and destroy Plaintiffs' property.

The State Defendants reply that there are no allegations or evidence that Mary Mayhew personally engaged in any of the conduct at issue. Instead, Plaintiffs' claims are against DHHS, which is not a "person" for purposes of the MCRA.

The MCRA provides, in pertinent part, that a citizen may bring a civil action against any person who "intentionally interferes or attempts to intentionally interfere by physical force or violence against a person, damage or destruction of property or trespass on property or by the threat of physical force or violence against a person, damage or destruction of property or

trespass on property with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State." 5 M.R.S.A. § 4682(1-A).

In *Jenness v. Nickerson*, the Law Court explained that the "MCRA provides a private cause of action for violations of constitutional rights by 'any person.'" 637 A.2d 1152, 1158 (Me. 1994). Given Maine's general rule that "the State is not bound by a statute unless expressly named therein," *Jenness* determined that "the State is not a 'person' within the scope of the [Maine Tort Claims Act]." *Id.* Furthermore, a state official acting in his or her official capacity, is not a person within the meaning of the MCRA. *Doe v. Williams*, 2013 ME 24, ¶ 74, 61 A.3d 718.

Here, the court grants summary judgment against Ms. Perry and Mr. Dean's claims under the MCRA because DHHS, and Ms. Mayhew in her capacity as commissioner of DHHS, are not "persons" within the meaning of the MCRA and therefore no private cause of action is available against them.

F.    Whether Summary Judgment is Warranted Against Plaintiffs' 42 U.S.C. § 1983 Claims

Both Plaintiffs assert causes of action pursuant to 42 U.S.C. § 1983 against Ms. Archer, Mr. Vaughan, and Attorney Cardone for violating their due process rights. The State Defendants argue that summary judgment is warranted against these claims because both Plaintiffs were afforded fair process and the State Defendants did not engage in any behavior that shocks the conscience. Plaintiffs respond that material issues of fact prevent the court from granting summary judgment against their Section 1983 claims. They assert that intentional state action caused Ms. Perry to lose her home and personal property, while Mr. Dean lost his Owls Head cottage, car, cat, and virtually all of the contents of the Rockland house.

56

42 U.S.C. § 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…." Accordingly, section 1983 "provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Della*, 132 S. Ct. 1657, 1661 (2012). "Private action, 'no matter how discriminatory or wrongful,' may not be reached through section 1983." *Holland v. Sebunya*, 2000 ME 160, ¶ 11, 759 A.2d 205 (quotation omitted). "To state a claim for relief in an action brought under § 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States…." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "[A] violation of state law is not cognizable under § 1983." *Lord v. Murphy*, 561 A.2d 1013, 1017 (Me. 1989).

"The Due Process Clause protects individuals against two types of government action. So called-substantive due process…and procedural due process." *United States v. Salerno*, 481 U.S. 739, 746 (U.S. 1987) (citations omitted)

1.   *Plaintiffs' Procedural Due Process Claims*

Procedural due process ensures that when government action deprives a person of life, liberty, or property, it is done in a fair manner. *Salerno*, 481 U.S. at 746. In analyzing procedural due process claims, the court utilizes a two-step inquiry: "first, we determine whether the government action has deprived the claimant of a protected property interest and second, if such a deprivation occurred, we must determine what process is due pursuant to the Fourteenth Amendment." *Merrill v. Me. Pub. Empls. Ret. Sys.*, 2014 ME 100, ¶ 21, 98 A.3d 211 (citation omitted). In determining what process is due, the court considers three factors: "(1) the private interest that will be affected by the State action; (2) the risk of an erroneous

57

deprivation of the property interest at issue; and (3) the Government's interest, including the function involved and the administrative burden that additional or substitute procedural requirements will entail." *Id.* at ¶ 22 (citation omitted).

However, in order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that were available, unless the processes were patently inadequate. *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000); *Bohn v. County of Dakota*, 772 F.2d 1433, 1441 (8th Cir. 1985); *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982). A due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Alvin*, 227 F.3d at 116 (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Alvin*, 227 F.3d at 116 (citing *McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995); *Dwyer v. Regan*, 777 F.2d 825, 834-35 (2d Cir. 1985) (modified on other grounds by 793 F.2d 457 (2d Cir. 1986); *Riggins v. Board of Regents*, 790 F.2d 707, 711-12 (8th Cir. 1986)).

a.    Ms. Perry's Procedural Due Process Claims

Although the basis for Plaintiffs' section 1983 claims are not entirely clear, it appears that Ms. Perry's claims stem from the alleged failure to provide her notice of the September 6, 2012 hearing that resulted in DHHS being appointed temporary conservator. Ms. Perry appears to allege that as a result of this initial defect in due process, she went on to suffer harm when DHHS locked her out of the Owls Head cottage, sold the cottage for less than fair market value, sold and/or misplaced her personal property, and attempted to sell the Rockland house.

These claims, however, cannot survive summary judgment because the record is clear that Ms. Perry did not utilize all of the processes available to her before bringing the present suit. Specifically, the Probate Court's September 6, 2012 Order appointing DHHS as

58

temporary conservator provided that "[if] it comes to the Court's attention…that the issue exists with respect to whether the temporary conservatorship is in the allegedly protected person's best interests, the Court shall hold an expedited hearing within 40 days of the entry of the ex parte order." Ex. F to Archer Aff. It is undisputed that Ms. Perry learned about DHHS's appointment as temporary conservator on the morning of September 6, 2012. (Pl.s' A.S.M.F. ¶ 54.) Despite the availability of this process—and others—Ms. Perry did not object or seek to remove DHHS as temporary conservator for Mr. Dean until March 1, 2013—5 days before the conservatorship expired on March 6. (Def.s' Supp. S.M.F. ¶ 49.)

To the contrary, Ms. Perry, through her attorney at the time, filed an objection to DHHS's appointment on October 19, 2012, which requested that the Probate Court continue DHHS's temporary conservatorship "until such time as the Court may hear and rule upon a family member's competing Joint Petition." (Ex. J to Archer Aff. at p. 2.)

Furthermore, the record is clear that Ms. Perry had notice of DHHS's intent to sell the Owls Head cottage no later than November 12, 2012, when she sent an email acknowledging that the cottage had been listed.[16] (*See* Def.s' Supp. S.M.F. ¶ 59.) As such, Ms. Perry had ample opportunity between the date she learned of the intent to sell the cottage and the actual sale thereof to challenge the sale in court and/or assert her rights to reside therein. Rather than promptly assert her rights, Ms. Perry did not act until an attorney informed Attorney Cardone that he would be filing a motion for a temporary restraining order to enjoin the sale of the cottage. (Def.s' Supp. S.M.F. ¶ 77-78.) The motion for a temporary restraining order, however, was not filed until after the closing occurred. (*See* Cardone Aff. ¶ 21; Def.s' Supp. S.M.F. ¶¶ 93-98.) While Plaintiffs have criticized the purported act of the State Defendants

---

[16] Arguably, Ms. Perry was on constructive notice of DHHS's intent to sell the cottage on September 6, 2012—when she learned of the temporary conservatorship—or at least by November 6, 2012 when DHHS locked her out of the cottage. (Pl.s' A.S.M.F. ¶ 90.)

59

to move the closing of the cottage to avoid a possible injunction, there is no indication that any State Defendant acted unlawfully. Accordingly, to the extent Ms. Perry's claims against Ms. Archer, Mr. Vaughan, and Attorney Cardone are premised on a violation of her procedural due process rights, the claims cannot survive summary judgment.

b.      Mr. Dean's Procedural Due Process Claims

To the extent Mr. Dean claims that his procedural due process rights were violated, summary judgment is warranted against those claims because the Maine Probate Code provided him with sufficient due process. The parties agree that Mr. Dean was incapacitated and in need of a conservator at all relevant times. (Pl.s' A.S.M.F. ¶ 220.) As a result, any procedural due process claims asserted on his behalf must be addressed against the process whereby he was appointed a temporary conservator. The only defect Mr. Dean appears to raise against the process afforded him is premised on alleged lies made by the individual State Defendants to the Probate Court. These issues, however, speak to the State Defendants' performance of the temporary conservatorship, not the process by which the temporary conservatorship was enacted. Accordingly, summary judgment is warranted against Mr. Dean's section 1983 claims to the extent they are premised on violations of his procedural due process rights.

2.      *Plaintiffs' Substantive Due Process Claims*

Substantive due process prevents the government from engaging in conduct that "shocks the conscience" or interferes with rights implicit in the concept of ordered liberty. *United States v. Salerno*, 481 U.S. 739, 746 (U.S. 1987). "The burden to show state conduct that 'shocks the conscience' is extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere violation of state law, even violations resulting from bad faith' to 'something more egregious and more extreme.'" *J.R. v. Gloria*, 593 F.3d 73, 80 (1st

60

Cir. 2010) (quotation omitted). "The state action must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir 2005) (quotation omitted).

When the State creates a "special relationship" because of limitations that the State has imposed on an individual's freedom to act on his own behalf, the State may be held liable for a substantive due process violation if it fails to protect the individual. *J.R. v. Gloria*, 593 F.3d at 79-80. When such a relationship is established, the claim against the defendants "must also involve 'conscience-shocking' conduct by state officials, and the official conduct most likely to rise to the conscience-shocking level is the conduct intended to injure in some way unjustifiable by any government interest." *Id.* (quotation and citations omitted). Accordingly, negligence by a state official, without more, is insufficient to meet the conscience-shocking standard. *Id.* at 80. In addition, deliberately indifferent behavior does not per se shock the conscience. *Id.* Instead, such behavior can only shock the conscience where the "actors have an opportunity to reflect and make reasoned and rational decisions[.]" *Id.*

In addition, governmental officials are protected from claims under 42 U.S.C. § 1982 under the doctrine of qualified immunity unless their actions violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223,231 (2009) (quotation omitted); *see also Pratt v. Ottum*, 2000 ME 203, ¶¶ 16-17, 761 A.2d 313. "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "However, the doctrine is not without limits. Despite the breadth of its prophylactic sweep, 'qualified immunity does not shield public officials who, from an objective standpoint, should have known that their conduct was

unlawful.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (internal quotation marks omitted).

Finally, officials are entitled to qualified immunity unless: 1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and 2) the right at issue was clearly established at the time of the alleged misconduct. *Walden v. City of Providence*, 596 F.3d 38, 52 (1st Cir. 2010). The second prong has two aspects: the first "focuses on the clarity of the law at the time of the alleged civil rights violation" such that to overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (citation omitted). The second aspect "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the Plaintiffs' constitutional rights." *Id.* The salient question "is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id.* "The availability of the qualified immunity defense is a question of law." *Pratt*, 2000 ME 203, ¶ 15, 761 A.2d 313.

a.    <u>Substantive Due Process Claims Against Ms. Archer</u>

Plaintiffs appear to allege that Ms. Archer violated their substantive due process rights through the following actions: 1) failing to provide Ms. Perry notice of the September 6, 2012 hearing about appointing a conservator for Mr. Dean; 2) lying about providing Ms. Perry notice thereof; 3) lying to the Probate Court about the basis for appointing Mr. Dean a conservator; 4) lying about the lack of a suitable private party to serve as Mr. Dean's conservator; 5) attempting to cover up the fact that the water pipes burst at the Rockland house under DHHS's watch by implying that (a) the pipes burst due to Mr. Dean's maintenance and (b) falsely asserting that an appraisal was carried out on the house valuing it at $65,000; and 6)

making misrepresentations to the Rockland Animal Hospital to induce them to euthanize Mr. Dean's cat, Caterpillar. Plaintiffs contend that any reasonable social worker in Ms. Archer's position would have known that a $5,191.29 tax bill was not an "emergency," that there was no real risk of eminent foreclosure, that giving false testimony in the hopes of covering up damage DHHS caused to the Rockland house was unlawful, and that killing a cat to address a trumped up financial emergency is unlawful.

While some of Ms. Archer's actions and decisions could be viewed as negligent, especially with the benefit of hindsight, they were not without justification. There definitely was an emergency resulting from the imminent tax foreclosure—had it materialized, the consequences for Mr. Dean could have been even worse. As to Caterpillar, Ms. Archer gave Ms. Perry an opportunity to take in Caterpillar and she turned it down. As to the allegations about Ms. Archer having lied to the Probate Court, there is nothing from a causation standpoint to connect any alleged lie to any substantive due process violation. Accordingly, the court grants summary judgment against Ms. Perry and Mr. Dean on their 42 U.S.C. § 1983 claims against Ms. Archer.

b.      Substantive Due Process Claims Against Mr. Vaughan

Plaintiffs appear to base their substantive due process claims against Mr. Vaughan on his actions of closing off the Rockland house, taking exclusive possession thereof, failing to winterize the property, failing to remedy water damage, and selling the Owls Head cottage for less than fair market value.

Here, no reasonable jury could conclude that Mr. Vaughan behaved in a manner that shocks the conscience. Viewing the facts in the light most favorable to Plaintiffs, Mr. Vaughan at worst displayed inattention in handling Mr. Dean's estate and finance, and there is no admissible evidence of any malice or bad faith on the part of Mr. Vaughan. To the contrary it

63

indicates that he was attempting to work on Mr. Dean's behalf, although his efforts may have been misguided. (*See also* Dean's Supp. S.M.F. ¶ 37) (refusing to sign the purchase and sale agreement for the Owls Head cottage until the sale price was authorized by the Asset Disposition Committee.)

Furthermore, there is no evidence to suggest that Mr. Vaughan denied others access to the Rockland house for any reason other than to facilitate its sale and the sale of the personal property located therein for the benefit of Mr. Dean's estate. Likewise, there is no evidence to support an inference that Mr. Vaughan stood to profit from the sale of Mr. Dean's personal property. The fact that Mr. Vaughan and Mr. Thistle did not reach an integrated agreement on the terms by which Mr. Dean's personal property was to be auctioned does not give rise to an inference that Mr. Vaughan was acting pursuant to his own pecuniary benefit or otherwise acted in a manner that shocks the conscience. (Vaughan Dep. 161:10-163:10; Thistle Dep. 24:18-26:18.) Neither does the fact that Mr. Vaughan did not prepare a written list or inventory of personal property at Mr. Dean's Rockland house before Mr. Thistle started removing marketable items. (Pl.s' A.S.M.F. ¶ 128.)

While a reasonable jury could conclude that Mr. Vaughan's work on Mr. Dean's behalf was negligent in some respects, in others it was not. Specifically, Mr. Vaughan filed an inventory of the conservatorship estate on December 6, 2012 and, when the conservatorship terminated, requested Mr. Thistle return all unsold items and to make a separate list of items that he sold and items he returned. (Pl.s' A.S.M.F. ¶¶ 145-148; Vaughan Aff. ¶ 23.) In addition, Mr. Vaughan provided Ms. Perry three hours to remove items from the Owls Head cottage even though he doubted her claim to the property therein. (7/27/15 Perry Aff. ¶ 32; Vaughan Aff. ¶ 25.)

64

Although Ms. Perry now claims this was not sufficient time, she does not say what specific pieces of property she had to leave behind. Also, she evidently did not say that she needed more time to remove her property. (Vaughan Aff. ¶ 26; 7/27/15 Perry Aff. ¶¶ 32, 33, 39.)

Similarly, viewing the evidence in the light most favorable to Plaintiffs' a reasonable jury could conclude that Mr. Vaughan was negligent in failing to winterize the Rockland house. (Ex. C to Vaughan Aff.; Vaughan Aff. ¶ 32.) However, even in that light, nothing in the record rises to the level of a constitutional violation. Accordingly, the court grants summary judgment against Ms. Perry and Mr. Dean's 42 U.S.C. § 1983 claims against Mr. Vaughan.

c.     <u>Substantive Due Process Claims Against Attorney Cardone</u>

Plaintiffs appear to allege that Attorney Cardone violated their substantive due process rights by: 1) lying about the burst water pipe at the January 25, 2013 hearing; 2) allowing Ms. Archer to testify falsely thereon; 3) filing a motion to clarify the Probate Court's January 25, 2013 Order; and 4) expediting the closing of the Owls Head cottage to deny Ms. Perry the opportunity to be heard.

Here, Attorney Cardone did not testify about the burst water pipe at the Rockland house and she has expressly stated that she did not know about the circumstances leading to the burst water pipe before the January 25, 2013 hearing. (*See* Ex. 55 to Pl.s' A.S.M.F.; Cardone Aff. ¶¶ 27-28.) Aside from Ms. Archer and Mr. Vaughan's knowledge thereof, there is no evidence from which to infer Attorney Cardone knew about the burst water pipe or the circumstances leading thereto. Indeed, Attorney Cardone's testimony at the January 25, 2013 hearing supports her lack of knowledge. (Ex. 55 to Pl.s' A.S.M.F., 8 (Attorney Cardone states that she believes the September 6, 2012 Order appointing DHHS as temporary conservator was signed in November 2012) 10 (deferring to Ms. Archer for an explanation of where Mr. Dean's

65

properties stand).) At most, the evidence indicates that Attorney Cardone was negligent in not keeping herself up to date regarding the case.

Furthermore, Attorney Cardone did not cause the water pipe to burst or delay its discovery, as the evidence indicates that she learned about the existence thereof at the same time Ms. Perry did. Finally, there is no evidence that Attorney Cardone behaved in a manner that shocked the conscience by filing the February 20, 2013 motion to clarify the Probate Court's January 25, 2013 Order. That motion sought to clarify that the property referred to in the motion was the Rockland house. (Ex. C to Cardone Aff.) The fact that this action was designed to help move forward with the sale of the Rockland house, which did not occur anyway, does not somehow constitute a violation of either of the Plaintiffs' substantive due process rights. Accordingly, the court grants summary judgment against Ms. Perry and Mr. Dean's 42 U.S.C. § 1983 claims against Attorney Cardone.

*III. Conclusion*

For the reasons discussed it is hereby ORDERED AND ADJUDGED AS FOLLOWS:

The State Defendants' motion for summary judgment is granted against Plaintiff Claire Perry on the following counts of Ms. Perry's First Amended Complaint:

| | |
|---|---|
| Count IV: | Interference with contract or expectancy |
| Count V: | Breach of fiduciary duty against DHHS; |
| Count VI: | Deprivation of Property without Due Process pursuant to the Maine Civil Rights Act against DHHS; |
| Count VIII: | Abuse of process against Janice Archer; |
| Count IX: | Violation of 42 U.S.C. § 1983 deprivation of due process against Janice Archer; |
| Count X: | Abuse of process against David Vaughan; |
| Count XI: | Violation of 42 U.S.C. § 1983 deprivation of due process against David Vaughan; and |

66

Count XIV:     Violation of 42 U.S.C. § 1983 deprivation of due process against Barbara Cardone.

In addition, the State Defendants' motion for summary judgment is granted against the following counts of Mr. Dean's cross-claims in *Perry v. Dean*:

Count III:      Negligent discharge of pollutants against DHHS;

Count V:        Violation of the Maine Civil Rights Act against DHHS;

Count VII:      Intentional misrepresentation against Barbara Cardone;

Count VIII:     Abuse of process against Barbara Cardone;

Count IX:       Violation of 42 U.S.C. § 1983 deprivation of due process against Barbara Cardone;

Count X:        Breach of fiduciary duty against Barbara Cardone;

Count XI:       Intentional misrepresentation against Janice Archer;

Count XII:      Violation of 42 U.S.C. § 1983 deprivation of due process against Janice Archer;

Count XIII:     Conversion against David Vaughan; and

Count XIV:      Violation of 42 U.S.C. § 1983 deprivation of due process against David Vaughan.

The State Defendants' motion for summary judgment is denied as to Count IV of Mr. Dean's cross-Claim for breach of fiduciary duty in *Perry v. Dean*, and Mr. Dean's claim against DHHS in *Vose v. Taylor* for abuse of authority granted by the Probate Court's temporary conservatorship order—to the extent that claim alleges a breach of fiduciary duty by DHHS.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: December 3, 2015

_____
A.M. Horton
Justice, Business & Consumer Court

STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-CV-13-48

*CUM-AMH-04-03-14*

|  |  |
|---|---|
| CLAIRE DEAN PERRY, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WILLIAM T. DEAN, JR., | ) |
| DEPARTMENT OF HEALTH AND | ) |
| HUMAN SERVICES, as Conservator and | ) |
| Guardian of William T. Dean, Jr., | ) |
| KEYBANK, N.A. as successor to KEY | ) |
| TRUST COMPANY OF MAINE and | ) |
| Trustee of the ALICE DEAN | ) |
| REVOCABLE TRUST, JANICE | ) |
| ARCHER, DAVID VAUGHAN, DAVID | ) |
| G. THISTLE, and BARBARA A. | ) |
| CARDONE, | ) |
| | ) |
| Defendants | ) |
| | ) |

## ORDER ON PENDING MOTIONS

The court held oral argument on March 5, 2014, on three pending issues: 1) Defendant William T. Dean, Jr.'s motion to hold an evidentiary hearing on the motion of Defendant Department of Health and Human Services (the Department) to disqualify; 2) the Department's motion to disqualify Mr. Dean's counsel; and 3) KeyBank, N.A.'s motion to sever. As indicated on the record at the hearing, the court denied Mr. Dean's motion to hold an evidentiary hearing because the Department and KeyBank stipulated to the testimony that the potential witnesses would have provided and thus the evidentiary hearing was unnecessary.

1

At oral argument, the court indicated an intention to deny KeyBank's motion to sever without prejudice because although the time periods in question are different, the court concludes there may be common issues of fact regarding Defendant Dean. *See* M.R. Civ. P. 20(a), 21. However, as indicated at a discovery conference April 1, 2014, the court is reserving decision on KeyBank's motion to sever in light of a related case, *Vose v. Taylor,* recently docketed as Maine Business & Consumer Court Docket No. BCD-CV-14-14.

The last motion for the Court's determination is the motion of the Department to disqualify Attorney David Jenny. KeyBank joins the motion to disqualify. The Law Court has recently clarified the standard for disqualifying an attorney:

> First, disqualification must serve the purposes supporting the ethical rules. A party moving to disqualify an attorney has the burden of demonstrating more than mere speculation that an ethics violation has occurred; she must establish in the record that continued representation of the nonmoving party by that party's chosen attorney results in an affirmative violation of a particular ethical rule. . . .
>
> Second, [there must be] a showing that continued representation by the attorney would result in actual prejudice to the party seeking that attorney's disqualification. [C]ourts will not assume the existence of prejudice to the moving party just by the mere fact that an ethical violation was committed[.] Rather, the moving party must point to the specific, identifiable harm she will suffer in the litigation by opposing counsel's continued representation. Indeed, to allow disqualification with proof of anything less than such actual prejudice would be to invite movants to employ this obvious vehicle for abuse.
>
> [Third], if the moving party produces evidence of both an ethical violation and actual prejudice, any court order disqualifying the attorney must include express findings of that ethical violation and resulting prejudice.

*Morin v. Me. Educ. Ass'n,* 2010 ME 36, ¶¶ 9-11, 993 A.2d 1097.

The Department asserts that M.R. Prof. Conduct 1.7 is being violated by Attorney Jenny's representation of Mr. Dean because Attorney Jenny formerly represented Ms. Perry in a probate proceeding related to DHHS's guardianship of Mr. Dean. (*See* DHHS Exh. E.) That same guardianship is part of the present controversy between the parties. (*See* Amend. Compl.

2

¶¶ 16-17.) In the guardianship proceeding, after Attorney Dill succeeded Attorney Jenny as counsel, Ms. Perry submitted a claim to the Probate Court for $120,000 against Mr. Dean. (DHHS Exhs. I-J.)

Rule 1.7 prohibits the representation of a client if the representation is a concurrent conflict of interest; in this case, "a significant risk that the representation of one or more clients would be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." M.R. Prof. Conduct 1.7(a)(2). The only exception is if "(1) the lawyer reasonably believes that the lawyer would be able to provide competent and diligent representation to each affected client; and (2) each affected client gives informed consent, confirmed in writing." M.R. Prof. Conduct 1.7(b). The Department asserts that Attorney Jenny's representation of Mr. Dean will be materially limited both by his prior representation of Ms. Perry and his personal friendship with Ms. Perry.[1]

The court has serious doubts about the representation of Mr. Dean by Attorney Jenny based on the concurrent conflict of interest issue. Although Mr. Dean and Ms. Perry may settle their portion of this case, their interests are clearly adverse to one another. Adversity of interests is not affected by settlement.

Attorney Jenny asserts that he has analyzed the rule and is confident that he can provide competent representation to each client. It is the court's understanding that Ms. Perry consents to Attorney Jenny's representation of Mr. Dean, but the record does not indicate that she has given

---

[1] It is worth noting that the Department is a third party to the attorney-client relationship. Nevertheless, at least one case in Maine has addressed the motion of a third party to disqualify a law firm based on that firm's prior representation of a client. *See In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 2001 WL 64775 (D. Me. Jan. 26, 2001) (Hornby, J.). The fact that the *Compact Disc* case involving a motion to disqualify class counsel does, in this court's view, materially distinguish that case from this on the merits of the disqualification issue, but the *Compact Disc* decision is authority supporting the Department's and KeyBank's standing to pursue the motion.

informed consent in writing to Attorney Jenny's representation of Mr. Dean.[2] This Order thus requires proof of such consent as a condition to Attorney Jenny's continued representation of Mr. Dean.

In the alternative, KeyBank provides a different basis for disqualification: Attorney Jenny's status as a necessary witness. M.R. Prof. Conduct 3.7 states:

> (a) A lawyer shall not act as advocate at a tribunal in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.

M.R. Prof. Conduct 3.7(a).[3]

KeyBank states that Attorney Jenny is a factual witness and that it intends to depose Attorney Jenny in the course of the litigation. KeyBank asserts that Attorney Jenny's testimony is necessary because it is relevant, material, and unobtainable from other sources. Specifically, KeyBank asserts that Attorney Jenny has knowledge of Mr. Dean's alleged acknowledgement of

---

[2] The record includes the affidavit of Pamela Vose, Mr. Dean's conservator, who consents to the representation of Mr. Dean by Attorney Jenny (Mr. Dean Exh. D. at 2) and whose authority as conservator includes the power to "[p]ay, settle, prosecute or contest any claim involving [Mr. Dean]" (Ms. Perry Exh. 1 at 3).

[3] The comments to the rule instruct:

> Whether the tribunal is likely to be misled or the opposing party is likely to suffer prejudice depends on whether it is a bench, jury trial, or other proceeding the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses. Even if there is risk of such prejudice, in determining whether the lawyer should be disqualified, due regard must be given to the effect of disqualification on the lawyer's client. It is relevant that one or both parties could reasonably foresee that the lawyer would probably be a witness. . . .

M.R. Prof. Conduct 3.7 cmt. [4].

draining the trust, Mr. Dean's mental health status, and Mr. Dean's alleged agreement with Ms. Perry to pay her back the money he allegedly misappropriated from the trust. KeyBank contests these issues seriously. Attorney Jenny candidly admitted at the hearing that his testimony was relevant and material, but he disputes that it is unobtainable from other sources.

On the present record, the court is not persuaded that Attorney Jenny is indeed a necessary witness or that disqualification is required. However, whether he is a necessary witness depends on what material testimony he, and only he, can provide—a question that likely will require a comparison of his prospective testimony with that of other witnesses. For that reason, the court will permit any party to take Attorney Jenny's deposition upon oral examination.

Moreover, Attorney Jenny asserts that Mr. Dean would likely not be able to retain substitute counsel if Attorney Jenny is disqualified. The court's limited understanding of Mr. Dean's situation is consistent with that assertion. Thus, there is an issue of "substantial hardship" for purposes of Rule 3.7(a)(3).

On this record, considering all relevant factors, the court will deny the Motion to Disqualify without prejudice to its renewal. Attorney Jenny and Mr. Dean, and Mr. Dean's conservator, Pamela Vose, are clearly on notice of the possibility that the motion to disqualify might be renewed at a later stage of the case, such that, if the motion were granted, Mr. Dean would be disadvantaged even more than if disqualification were to occur now.

IT IS HEREBY ORDERED:

1. The Department's motion, with joinder by KeyBank, to disqualify Attorney Jenny from representing William Dean in this case is hereby denied without prejudice, on the following two conditions:

5

(a) within 14 days, Attorney Jenny files proof that Claire Dean Perry has provided informed consent in writing to Attorney Jenny's representation of William Dean in this case, and

(b) that Attorney Jenny consent to and participate in a deposition upon oral examination, if noticed by any party, pursuant to M.R. Civ. P. 30. At such a deposition, Attorney Jenny or any other party may object on the ground of attorney-client privilege, attorney work product or any other privilege for refusing to answer. If objection based on privilege or attorney work product is made, the answer need not be given, pending further order of court.

Pursuant to M.R. Civ. P. 79, the clerk is hereby directed to incorporate this order into the docket by reference.

Dated April 3, 2014

A. M. Horton
Justice, Business and Consumer Court

Claire Dean Perry

v.

William T. Dean, Jr., Department of Health and Human Services, as Conservator and Guardian of William T. Dean, Jr., Keybank, N.A. as successor to Key Trust Company of Maine and Trustee of the Alice Dean Revocable Trust, Janice Archer, David Vaughan, David G. Thistle, and Barbara A. Cardone

BCD-CV-13-48

**Claire Dean Perry**
**Plaintiff**
    Counsel:                    Cynthia Dill, Esq.
                                511 Congress Street
                                PO BOX 9711
                                Portland, ME 04104

**Department of Health and Human Services, as Conservator and Guardian of William T. Dean, Jr., Janice Archer, David Vaughan**
    **Defendants**
    Counsel:                     Katherine Greason, Esq.
                                  6 State House Station
                                Augusta, ME 04333

**William T. Dean, Jr.**
    **Defendant**
    Counsel:                     David Jenny, Esq.
                                  11 Shell St
                                  PO BOX 252
                                  Owls Head, ME 04854

**Keybank, N.A. as successor to Key Trust Company of Maine and Trustee of the Alice Dean Revocable Trust**
    **Defendants**
    Counsel:                     John Aromando, Esq.
                                  Merrills Warf
                                  254 Commercial St.
                                  Portland, ME 04101

**David G. Thistle**
    **Defendant**
    Counsel:                     Thomas Bell, Esq.
                                  14 Maine St. Suite 413
                                  Brunswick, ME 04011